BRIAN M. BARNARD   USB # 0215
Utah Legal Clinic
Cooperating Attorneys for
     Utah Civil Rights & Liberties
     Foundation, Inc.
214 East Fifth South Street
Salt Lake City, Utah     84111-3204
Telephone: (801) 328-9531



FILED

2004 APR 27 A 11: 42

U.S. DISTRICT COURT
DISTRICT OF UTAH

**ATTORNEYS FOR PLAINTIFFS**

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH   CENTRAL DIVISION

| | | |
|---|---|---|
| **J. BRONSON,**<br>**G. LEE COOK** and<br>**D. COOK,** | : | **MEMORANDUM IN SUPPORT**<br>**OF PLAINTIFFS' MOTION**<br>**FOR SUMMARY JUDGMENT** |
|      Plaintiffs, | : | |
| vs. | : | |
| **SHERRIE SWENSEN,** Salt Lake County<br>Clerk, | : | Case No. 02:04-CV-0021 TS |
|      Defendant. | : | (Judge Ted Stewart) |
| | : | |

     PLAINTIFFS, have moved for summary judgment in their favor granting plaintiffs the

relief sought in their complaint.  That motion is supported by the papers filed herein including the

Complaint (Doc. # 1), the Affidavit of J. Bronson (Doc. # 2), the Affidavit of G. Lee Cook (Doc.

# 3), the Affidavit of D. Cook (Doc. # 4), the Stipulation of Facts (Doc. # 5) and Plaintiffs'

Statement of Undisputed Facts (Doc. # 7).  Based upon these pleadings and papers, there are no

material issues of fact in substantial dispute and this case may be resolved as a matter of law.

10

## PRELIMINARY STATEMENT

This action seeks a judicial determination as to the unconstitutionality of two (2) provisions of Utah law and federal law that make criminal the religious practice of polygamy.[1] Plaintiffs applied for a marriage license from defendant Sherrie Swensen, the Salt Lake County Clerk.  Defendant refused to issue that license because the proposed marriage of G. Lee Cook to J. Bronson would have violated the challenged statutes -- G. Lee Cook was already legally married to D. Cook.  Based upon that refusal, this action was filed.

Deeply held religious beliefs mandate that plaintiffs enter into plural marriage:  Belief in and practice of polygamous marriage is a requisite for plaintiffs' exaltation and eternal salvation.

Plaintiffs seek an end to the criminalization of the practice of religious polygamy.  Utah may be reluctant to affirmatively sanction plural marriage with concomitant legal rights, however pursuant to Lawrence v. Texas,123 S. Ct. 2472 (2003) it must cease criminalization of such relationships.  Even if no legal marital rights are afforded a second or third spouse, those individuals should not be branded as criminals nor continue to fear criminal prosecution.  A man should not be criminally prosecuted because he, for religious reasons, concurrently has a marital relationship with more than one woman and/or the mothers of his children.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

---

[1] The Utah criminal statute which prohibits polygamy is the statutory prohibition of bigamy.  Ut. Code Ann. §76-7-101 (1953 as amended).

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of establishing the absence of any genuine issue of material fact. *See* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). All reasonable inferences and ambiguities are drawn in favor of the nonmoving party. *See* <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). The court "constru[es] all facts and reasonable inferences in a light most favorable to the nonmoving party." <u>Pub. Serv. Co. of Colo. v. Cont'l Cas. Co.</u>, 26 F.3d 1508, 1513 (10th Cir.1994).

"[S]ummary judgment should be granted where the evidence is such that it would require a directed verdict for the moving party." <u>Liberty Lobby, Inc.</u>, 477 U.S. at 251 (quotation omitted). The inquiry for summary judgment and a directed verdict are essentially the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Id.</u> at 251-52. "[T]he inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." <u>Id.</u> at 252. This case may be resolved as a matter of law because no material issues of fact are in substantial dispute.

## ARGUMENT

I.    <u>UTAH'S CRIMINALIZATION OF POLYGAMY IS AN UNCONSTITUTIONAL RESTRICTION OF THE RIGHT TO CONDUCT PERSONAL AND INTIMATE RELATIONSHIPS FREE FROM STATE INTRUSION.</u>

3

Ut. Code Ann. § 76-7-101 (1953 as amended),[2] Utah Constitution, Art. III, § 1[3] and the

Utah Enabling Act (Act of July 16, 1894, ch. 138, 28 Statutes at Large 107) Section Three,[4]

prohibit the practice of polygamy in Utah.  They are unconstitutional because they violate

---

[2] "A person is guilty of bigamy when, knowing he has a husband or wife or knowing the other person has a husband or wife, the person . . . cohabits with another person." Ut. Code Ann. § 76-7-101 (1953 as amended).

[3] The Utah Constitution provides in pertinent part:

The following ordinance shall be irrevocable without the consent of the United States and the people of this State:

[Religious toleration--Polygamy forbidden]

FIRST:--Perfect toleration of religious sentiment is guaranteed.  No inhabitant of this State shall ever be molested in person or property on account of his or her mode of religious worship;  but polygamous or plural marriages are forever prohibited.

Utah Const. art. III

[4] The Utah Enabling Act provides in part:

An Act To enable the people of Utah to form a constitution and state government, and to be admitted into the Union on an equal footing with the original States.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the inhabitants of all that part of the area of the United States now constituting the Territory of Utah, as at present described, may become the State of Utah, as hereinafter provided.
* * *
First.  That perfect toleration of religious sentiment shall be secured, and that no inhabitant of said State shall ever be molested in person or property on account of his or her mode of religious worship:  Provided, That polygamous or plural marriages are forever prohibited.

Act of July 16, 1894, ch. 138, 28 Stat. 107, 108.

4

individual liberty interests protected by the First and Fourteenth Amendments.

The Fourteenth Amendment protects a person from "unwarranted government intrusion." Lawrence v. Texas, 123 S. Ct. 2472, 2475. Lawrence is the most recent in a line of Supreme Court cases that have increasingly cordoned off from state invasion a realm of individual privacy grounded in the First Amendment and protected as a Fourteenth Amendment "liberty" interest. See generally id.

Starting with Griswold v. Connecticut, the Court recognized a protected privacy right extending to the marriage relation and the marital bedroom. 381 U.S. 479 (1965) (a state law prohibiting distribution of contraceptives and counseling for their use was invalid). Seven years later, the Court recognized that the Fourteenth Amendment accorded the same right to unmarried partners. Eisenstadt v. Baird, 405 U.S. 438 (1972) (law prohibiting distribution of contraceptives to unmarried couples found to be invalid). In the Court's next term, it recognized that a woman has a right to make fundamental choices regarding her body. Roe v Wade, 410 U.S. 113 (1973) (finding state statute unlawfully prohibited abortions). The Court found a state statute prohibiting abortion was unconstitutional as a woman's right to personal liberty extends to the decision whether to bear a child. Id. Finally, in Carey v. Population Services Int'l, a plurality of the Court recognized similar privacy protections for persons under the age of majority and invalidated a law withholding contraceptives from girls and boys under 16 years of age. 431 U.S. 678 (1977). Eisenstadt, Roe and Carey found an individual had a protected liberty interest to make decisions regarding contraception, pregnancy and abortion regardless of marital status.

In June 2003, the liberty interest protected by the Fourteenth Amendment was further

defined. In <u>Lawrence</u>, the United States Supreme Court specifically recognized the Fourteenth Amendment extends to give "substantial protection to adult persons in deciding how to conduct their lives in matters pertaining to sex." <u>Lawrence</u>, 123 S. Ct. at 2480 (2003). The Court held that the Texas legislature could not criminalize sodomy between two consenting homosexual adult males because the Fourteenth Amendment protects their right to engage in consensual sexual conduct in private without intrusion from the state. <u>Id.</u> The Court held such conduct to be private within the protected liberty interests of adults who may not be punished or branded as criminals. <u>Id.</u>

A.   An individual's right to engage in consensual sexual conduct without state intrusion protects consenting adults who wish to engage in polygamy.

<u>Lawrence</u> declares that the Constitution protects the liberty interests of all consenting adults to engage in private sexual conduct.[5]  The same protection must include polygamy. <u>Lawrence</u>, 123 S. Ct. at 2484.  <u>Lawrence</u> extends the interest protected by the Fourteenth Amendment to give an adult the right to engage in consensual sexual conduct in private free from state intrusion.  <u>Id</u>.  The <u>Lawrence</u> court held a personal private sexual relationship, whether or not entitled to formal recognition in law, is within protected liberty.  <u>Lawrence</u>, 123 S. Ct. at

---

[5]  Reference throughout this memo to sexual conduct protected by <u>Lawrence</u> is to adult, private, consensual, non-commercial and intimate conduct.
"The present case does not involve minors.  It does not involved persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused.  It does not involve public conduct or prostitution.  It does not involved whether the government must give formal recognition to any relationship that homosexual persons seek to enter.  The case does involve two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle." <u>Lawrence</u>, 123 S. Ct. at 2484.

6

2478.

Similarly, consenting adults should be free to choose personal relationships of a polyg-
amous nature without being charged or branded as criminals. Utah's statutory prohibitions make
criminal personal sexual relationships between consenting adults.[6] This prohibition of polyg-
amist relationships is as unconstitutional as Texas' prohibition against homosexual sodomy
because it criminalizes a private sexual relationship between consenting adults.

The right of consenting adults to engage in private sexual conduct is not limited to
homosexual adults. *See* Lawrence, 123 S. Ct. at 2482 and 2482 (O'Connor, J. concurring). The
Fourteenth Amendment allows all consenting adults to engage in private sexual conduct. Id. A
court can not limit privacy and liberty interests in consensual sexual conduct based upon gender.
Id. Homosexuals have a constitutional right to engage in intimate sexual acts without state
intrusion, therefore, heterosexuals have a similar constitutionally protected right. Id. The United
States Constitution must, as a matter of equal protection of the laws, protect the rights of
heterosexual couples to engage in similar private intimate sexual conduct.

The Constitution must protect other private intimate acts, such as sexual intercourse.
Lawrence provides individuals with protection from state intrusion as to intimate relationships.

---

[6] "A person is guilty of bigamy when, knowing he has a husband or wife or knowing the
other person has a husband or wife, the person . . . cohabits with another person." Ut. Code Ann.
§ 76-7-101 (1953 as amended).
    A married person simply living in a sexual relationship with another person to whom he
is not married is guilty of the crime of bigamy/polygamy. Deceit, fraud, mis-presentation or a
second marriage ceremony are not required to commit the crime. *See* id.
    Interestingly, the statute makes criminal as bigamy cohabitation by a married person with
a person of the same gender to whom he is not legally marriage.

7

<u>Lawrence</u>, 123 S. Ct. at 2477.  That right is not limited by the gender of the partners or the conduct in which they engage.  Neither can the right be limited to a traditional two person relationship.  As Justice Scalia noted in dissent, the principle enunciated in <u>Lawrence</u> may require "criminal laws against fornication, bigamy, adultery, adult incest, bestiality and obscenity" be declared unconstitutional.  <u>Lawrence</u>, 123 S. Ct. at 2495 (Scalia, J. dissenting).

Whether consenting adults choose to co-habit and engage in an intimate relationship with just one partner or with plural partners does not affect the intimate nature of the relationship.  The individual does not have less of a right to privacy because he cohabits and engages in intimate sexual conduct with more than one partner.

Statutes limiting sexual conduct to monogamous relationships violate concepts of equal protection and would cause highly inequitable results.  An unmarried man, however, who maintains sexual relations concurrently with more than one woman would not be guilty of a crime.[7]  Nevertheless, a man co-habiting and having sexual relations with two women concurrently and declaring them to be his wives, is guilty of polygamy.

The invasion of privacy and the inequity become clearer if the situations considered include children.  A man who concurrently has children by two different women and takes little responsibility for the women's and children's welfare is guilty of no crime.  However, the man who begets children by multiple women, publically declares the women to be his wives, main-

---

[7]  While such conduct may violate the provisions of Ut. Code Ann. § 76-7-104 (1953 as amended)("Any unmarried person who shall voluntarily engage in sexual intercourse with another is guilty of fornication," a class B misdemeanor), the continued validity of that statute is likewise subject to question in light of <u>Lawrence</u>.

tains a formal relationship supporting the women and children living in the same home, is a criminal guilty of polygamy.[8] The polygamist who seeks a formal relationship, acknowledges paternity and takes social responsibility is branded a criminal and is punished for his greater social and moral awareness.

B.   Laws against polygamy are unconstitutional restrictions of an individual's liberty interest: criminalizing polygamy does not further a compelling state interest.

A state may restrict an individual's constitutional right only to further a legitimate state interest. Lawrence, 123 S. Ct. at 2491. The Court in Lawrence found no compelling state interest in criminalizing homosexual sodomy based on a long history of states and/or a majority of society finding the practice immoral. Similarly, the state of Utah can offer no compelling justification for criminalizing polygamy. Therefore, the prohibitions must be nullified.

A statute criminalizing adult consensual private non-commercial cohabitation and polygamy (especially when practiced for religious reasons) has no conceivable legitimate state purpose. It merely stigmatizes as criminals substantial numbers of otherwise law abiding persons[9] who choose to enter into a formal permanent sexual relationship with other adults. In absence of a compelling state interest, Ut. Code Ann. § 76-7-101 (1953 as amended), Utah

---

[8] The polygamist father in such a situation may refrain from putting his name on his child's birth certificate for fear of incriminating himself and encouraging criminal prosecution.

[9] An estimated twenty thousand (~20,000) to forty thousand (~40,000) people in the western United States and Canada practice polygamy for religious reasons. *The Salt Lake Tribune*, "Charting polygamy leadership: Religious ideal grow, divides," 03/14/2004, G-2; *The Salt Lake Tribune*, "Critics Say Polygamy is Thriving," 08/20/2002, B-1.

Constitution, Art III §1, and the Utah Enabling Act (Act of July 16, 1894, ch. 138, 28 Statutes at Large 107) Section Three must be declared unconstitutional.

C.     Although the statutes are rarely enforced, the plaintiffs still suffer a real harm.

Statutes such as Utah's polygamy laws harm otherwise law abiding persons even though rarely enforced. Lawrence invalidated the Texas statute criminalizing homosexual sodomy despite the fact the law was rarely invoked. The Court found the statute unconstitutional despite rare enforcement because it placed a stigma on homosexuality which causes very real harm. The Court explained:

> . . . If protected conduct is made criminal and the law which does so remains unexamined for its substantive validity, its stigma might remain even if it were not enforceable as drawn for equal protection reasons. . . .
> The stigma this criminal statute imposes . . . is not trivial. . . . [I]t remains a criminal offense with all that imports for the dignity of the persons charged.

Lawrence, 123 S. Ct. at 2482.

> . . . The State cannot demean . . . [a person's] existence or control their destiny by making their private sexual conduct a crime. Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government. "It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter."

Id. at 2484 (quoting, Planned Parenthood of Southeastern Pennsylvania. v. Casey, 505 U.S. 833, 847 (1992)).

Justice O'Connor's concurrence in Lawrence further discusses the stigma created by the Texas sodomy statute; that analysis applies equally to stigma created by Utah's rarely enforced polygamy statute.

> And the effect of Texas' sodomy law is not just limited to the threat of prosecution or consequence of conviction. Texas' sodomy law brands all homosexuals as criminals, thereby making it more difficult for homosexuals to be treated in the same manner as everyone else.

Id., at 2486 (O'Connor, J. concurring).

> And because Texas so rarely enforces its sodomy law as applied to private, consensual acts, the law serves more as a statement of dislike and disapproval against homosexuals than as a tool to stop criminal behavior.

Id., (O'Connor, J. concurring).

> Indeed, Texas law confirms that the sodomy statute is directed toward homosexuals as a class. In Texas, calling a person a homosexual is slander *per se* because the word "homosexual" "impute[s] the commission of a crime." . . . The State has admitted that because of the sodomy law, being homosexual carries the presumption of being a criminal. *See* State v. Morales, 826 S. W. 2d, at 202-203 . . . . Texas' sodomy law therefore results in discrimination against homosexuals as a class in an array of areas outside the criminal law. *See* ibid.

Id., at 2487 (O'Connor, J. concurring).

By criminalizing sodomy between same sex couples, Texas branded all homosexuals as criminal, resulting in real injury. Branding them marginalizes the group and makes it far more difficult for homosexuals to be treated in the same was as everyone else. Lawrence, 123 S. Ct. at 2486. The Texas law served as an official statement of dislike and disapproval against homosexuals. Id. at 2486. Texas invited discrimination both in the public and private spheres. Id. at 2482. Similarly, Utah's criminalization of religious polygamy, even if the crime is rarely prosecuted, brands plaintiffs as criminals and sanctions public and private discrimination based on plaintiffs' religious based choice of marital relationship.

II.     UTAH CODE ANN. § 76-7-101 IS UNCONSTITUTIONAL UNDER THE FIRST

11

AMENDMENT BECAUSE THE STATUTE WAS SPECIFICALLY DESIGNED TO PROHIBIT THE RELIGIOUS PRACTICE OF POLYGAMY AND VIOLATES THE FUNDAMENTAL RIGHT TO ASSOCIATION.

Nearly 125 years ago, the United States Supreme Court upheld the polygamy conviction of Mormon Church member George Reynolds under the federal Morrill Antibigamy Act (1862). Reynolds v. United States, 98 U.S. 145, 168 (1878). The Reynolds Court called the practice of polygamy "odious" and more suited to "the life of Asiatic and of African people" than to the "northern and western nations of Europe." Id. at 164. The Court found the prohibition did not violate Reynold's First Amendment rights because the government could prohibit some religious conduct. Id. The Court established a bright-line rule, under which the government could not regulate "mere [religious] opinion" but was free to prohibit religious conduct that, in the government's view, constituted "an offence against society." Id.

In 1993, the United States Supreme Court found a city ordinance invalid which had the effect of prohibiting religious conduct. Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993). The Court nullified the city ordinance that prohibited religious animal sacrifice because the ordinance had been promulgated for the sole purpose of suppressing practices of the Santeria religion. Id. A regulation designed to prohibit religious practice or conduct is constitutional only if narrowly tailored to serve a compelling governmental interest. Id. at 531. The Court found the ordinance unconstitutional and not narrowly tailored to serve state interests related to animal cruelty and protecting public health. Id. at 538-39, 544-46.

In light of the Supreme Court's 1993 decision in Lukumi, the Court's 1878 decision in

12

Reynolds must be overruled.[10]  A state may not prohibit the religious practice of polygamy merely as conduct offensive to society.  Today, religious opinion and conduct are both protected by the First Amendment.  Lukumi, 508 U.S. 520.  Legislation restricting these rights must be narrowly tailored to serve a compelling state interest.  Id. at 531.  A mere statement that the conduct is "offensive to society" is not a compelling state interest.  Lawrence, 123 S. Ct. at 2491 (Scalia, J. dissenting).  Therefore, the decision in Reynolds need be overruled and Ut. Code Ann. §76-7-101 found to violate the First Amendment because:  1) Ut. Code Ann. §76-7-101 is specifically designed to prohibit the religious practice of fundamentalist members of the Church of Jesus Christ of the Latter-day Saints and is not narrowly tailored to further a compelling state interest; and, 2) a person's right to practice polygamy for religious reasons is protected by the First Amendment right to association and may not be restricted absent a compelling state interest.

A.    Utah's anti-bigamy law is unconstitutional because it is not neutral and not narrowly tailored.

Utah's anti-bigamy statute warrants strict scrutiny because it is not neutral.  A law that targets religious belief on its face is not neutral.  Lukumi, 508 U.S. at 533.  However, a law is also not neutral if it is facially neutral but has the effect of suppression of religion or religious conduct.  Id.  To determine whether a law is neutral, courts first look at the text.  Id. at 534.  However, facial neutrality is not determinative.  Id.  A court must look beyond the face of a document to "protect against governmental hostility which is masked, as well as overt."  Id. at

---

[10] Plaintiffs acknowledge the limited ability of this trial court to overrule a decision of the United States Supreme Court.

533-34 ("'The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders.'" (quoting Walz v. Tax Comm'n of New York City, 397 U.S. 664, 696 (1970) (Harlan, J., concurring)).  Therefore, the Supreme Court established the need to look beyond the face of the ordinance, and look to the purpose and effect of the regulation to determine whether a regulation is neutral.

If not neutral, a regulation is subjected to strict scrutiny to determine its constitutionality. Lukumi, 508 U.S. at 531.  To withstand strict scrutiny, a statute must be narrowly tailored to further a compelling state interest.  Id. at 531.  Ut. Code Ann. §76-7-101 is unconstitutional, is not neutral and is not narrowly tailored to further a compelling state interest.

i.    Utah's anti-polygamy law is not neutral because history shows it targets the religious practice of polygamy through its 'co-habit' provision.

Utah Code Ann. §76-7-101 is facially neutral.  However, its history shows the provision was passed for the direct purpose of prohibiting the religious practice of polygamy.  This purpose continues today through the inclusion of the term "co-habit" within the definition of the crime of bigamy.  The Mormon Church officially announced its endorsement of polygamy in 1852.[11]  At that time the federal government "moved to attack polygamy and the Mormon Church." Soc'y of

---

[11] The Church of Jesus Christ of Latter-day Saints, the Mormons, renounced the practice of polygamy in 1890 and today excommunicates members that practice or advocate plural marriage.  Since 1890, splinter groups of the Mormon Church, referred to as "fundamentalists," have continued to practice polygamy in Utah and the Western United States.  While the laws challenged herein were initially aimed directly at the Mormon practice of polygamy, today the challenged statutes are, with the acquiescence or approval of the Mormon Church, ironically aimed directly at "fundamentalist Mormons."

14

<u>Separationists, Inc. v. Whitehead</u>, 870 P.2d 916, 924 (Utah 1993).  It passed a series of federal

laws targeting Mormon polygamy.  The Morrill Antibigamy Act, Ch. 126, 12 Stat. 501 (1862);

The Edmunds Act, Ch. 47, 22 Stat. 30 (1882); The Edmunds-Tucker Act, Ch. 397, 24 Stat. 635

(1887).[12]  The federal government persisted in its campaign to eradicate the Mormon religious

practice of polygamy until it achieved substantial success.[13]

---

[12]  In debates over the Edmunds-Tucker Act, Florida Senator Wilkinson Call noted that
"[e]very line and every word in [the Act] ... accumulat[e] penalties upon penalties for practices
which are made violations of the law, and which are peculiar to those people [the Mormons] and
the outgrowth of their religious system."  18 Cong. Rec. 1903.

[13]  Congress first enacted an anti-polygamy law in 1862, 12 Stat. 501, (Morrill Anti-
Bigamy Act).  That statute explicitly annulled all laws of the Utah Territory that "establish,
maintain, protect, or countenance the practice of polygamy, evasively called spiritual marriage,
however disguised by legal or ecclesiastical solemnities, sacraments, ceremonies, consecrations,
or other contrivances."  <u>Id</u>.  The federal government's sustained efforts to wipe out the Mormon
religious practice of polygamy is well documented at length in numerous articles, books, and
opinions of the Utah Supreme Court.  <u>See, e.g.</u>, <u>Soc'y of Separationists, Inc. v. Whitehead</u>, 870
P.2d 916, 923-28 (Utah 1993) (describing the federal government's anti-polygamy laws as
targeted specifically against the Mormon Church and as playing a significant role in the history
of Utah's statehood); <u>State v. Barlow</u>, 153 P.2d 647, 649-51 (Utah 1944) (same); Edwin Brown
Firmage & Richard Collin Mangrum, <u>Zion in the Courts: A Legal History of the Church of Jesus
Christ of Latter-day Saints 1830-1900</u>, 129-260 (2001) (noting on page 210 that anti-polygamy
measures were only one aspect of the federal government's efforts to undermine the Mormon
Church's economic, social, and political power); L. Rex Sears, <u>Punishing the Saints for Their
"Peculiar Institution": Congress on the Constitutional Dilemmas</u>, 2001 Utah L. Rev. 581, 589-95
(discussing the chronology and legislative history of federal laws prohibiting Mormon
polygamy); <u>id</u>. at 625-29 (describing the Congressional debate over including a polygamy
prohibition in Utah's Enabling Act); Keith E. Sealing, <u>Polygamists Out of the Closet: Statutory
and State Constitutional Prohibitions Against Polygamy Are Unconstitutional Under the Free
Exercise Clause</u>, 17 Ga. St. U. L. Rev. 691, 703-04 (2001) (reciting same history as basis for re-
analyzing polygamy bans under <u>Lukumi</u>); Orma Linford, <u>The Mormons and the Law: The
Polygamy Cases – Part I</u>, 9 Utah L. Rev. 308 (1964) (discussing criminal sanctions aimed at
Mormon polygamy); Orma Linford, <u>The Mormons and the Law: The Polygamy Cases – Part II</u>, 9
Utah L. Rev. 543 (1965) (discussing civil sanctions aimed at Mormon polygamy).

Meanwhile, the Utah territory's efforts to gain statehood repeatedly failed. This was a direct result of the federal government's hostility towards religious based polygamy. Society of Separationists, 870 P.2d at 927 (quoting the Senate Committee on Territories' 1888 proposed resolution, 19 Cong. Rec. 433, 2391, that it is the "'sense of the Senate that the Territory of Utah ought not to be admitted into the Union as a State until it is certain beyond doubt that the practice of plural marriages, bigamy, or polygamy, has been entirely abandoned by the inhabitants of said Territory'"). Eventually, in 1894 the Federal Government granted Utah statehood provided the new state prohibit the practice of polygamy. The Utah Enabling Act, 28 Stat. 107 (1894).

The framers of the Utah Constitution worried that Utah Const. Article III's declaration that "polygamous or plural marriages are forever prohibited" would not sufficiently comply with the Federal government's demand that Utah ban polygamy as a condition of statehood as Article III's provision was not self-executing and the federal territorial laws banning polygamy would no longer apply once Utah became a state. Utah Const. art. III. The framers were worried that their renewed attempt to achieve statehood would once again fail so they specifically maintained the validity of the 1892 territorial law prohibiting polygamy in the State Constitution in an effort to ensure they met the requirements of the Enabling Act. State v. Norman, 52 P. 986, 990 (Utah 1898). The Utah Constitution expressly "declared" that this 1892 statute, "in so far as the same defines and imposes penalties for polygamy," will continue "to be in force" after Utah achieves statehood. Utah Const., art. XXIV, § 2. Thus, history clearly shows that Utah, following federal precedent, deliberately aimed its state law prohibiting polygamy directly at that religious practice.

Utah's current anti-bigamy statute, Ut. Code Ann. § 76-7-101, is the successor to the

1892 territorial law.[14]  Therefore, it remains directed at prohibiting the religious practice of

polygamy now by adherents to Mormon beliefs of the 1800's.  It states that "[a] person is guilty

of bigamy when, knowing he has a husband or wife or knowing the other person has a husband

or wife, the person purports to marry another person or cohabits with another person."  Every

state and territory in the United States prohibits bigamy.[15]  A significant number of other states

prohibit bigamous cohabitation, but only where a second marriage ceremony has actually

occurred.[16]

---

[14]  The main provision of this law, nearly identical to section 1 of the Federal Edmunds Act, 22 Stat. 30 (1882), stated:  "Every person who has a husband or wife living, who hereafter marries another, whether married or single, and any man who hereafter simultaneously, or on the same day, marries more than one woman, is guilty of polygamy."  R.S. 1892, Title 90, § 4208, subsequently renumbered, in 1917 as Title 119, § 8086; in 1933 as Ut. Code Ann. § 103-51-1; and in 1953 as Ut. Code Ann. § 76-53-1.  Section 76-53-1 was repealed together with the entire Criminal Code in 1973, when § 76-7-101 was enacted.

[15]  Except Hawaii which merely nullifies the second marriage.  Haw. Rev. Stat. §580.21 (Michie 1998).

[16]  See Ala. Code § 13A-13-1(a) ("A person who contracts a marriage outside this state, which would be bigamous if contracted in this state, commits bigamy by cohabiting in the state with the other party to such a marriage."); Cal. Penal Code § 281(b) ("[W]hen the second marriage took place out of this state, proof of that fact, accompanied with proof of cohabitation thereafter in this state, is sufficient to sustain the charge [of bigamy]."); Colo. Rev. Stat. § 18-6-201(1) ("Any married person who, while still married, marries or cohabits in this state with another commits bigamy . . . ." (emphasis added)); Conn. Gen. Stat. § 53a-190(a) ("A person is guilty of bigamy when he . . .  marries or purports to marry another person in any other state or country in violation of the laws thereof, and knowingly cohabits and lives with such other person in this state as husband and wife."); Ga. Code Ann. § 16-6-20(a) ("A person commits the offense of bigamy when he, being married and knowing that his lawful spouse is living, marries another person or carries on a bigamous cohabitation with another person."); Idaho Code § 19-2113 ("Upon a trial for bigamy, . . . when the second marriage took place out of this state, proof of that fact, accompanied with proof of cohabitation thereafter in this state, is sufficient to sustain the charge."); Ill. Rev. Stat., Ch. 38, par. 11-12(a) ("Any person having a husband or wife who

17

These prohibitions appear to be a means of asserting prosecutorial jurisdiction over those who

---

subsequently marries another or cohabits in this State after such marriage commits bigamy.");
Kan. Stat. Ann. § 22-2613 ("A person charged with the crime of bigamy may be prosecuted in
the county where the bigamous marriage ceremony was performed or in any county in which
bigamous cohabitation has occurred pursuant to such bigamous marriage."); Ky. Rev. Stat. Ann.
§ 530.010(1)(b) ("A person is guilty of bigamy when he . . . Cohabits in this state after a
bigamous marriage in another state."); La. Rev. Stat. Ann. § 14:76 ("Bigamy is . . . the habitual
cohabitation, in this state, with [a] second husband or wife, regardless of the place where the
marriage was celebrated."); Mass. Gen Laws ch. 272, § 15 ("Whoever, having a former husband
or wife living, marries another person or continues to cohabit with a second husband or wife in
the commonwealth shall be guilty of polygamy."); Mich. Comp. Laws § 750.439 ("Any person
who has a former husband or wife living, who . . . shall continue to cohabit with [a] second
husband or wife, in this state, he or she shall . . . be guilty of the crime of polygamy."); Mo. Rev.
Stat. § 568.010(2) ("A married person commits the crime of bigamy if he : . . Cohabits in this
state after a bigamous marriage in another jurisdiction."); Nev. Rev. Stat. 201.160(3) ("[W]hen
the second marriage has taken place without this state, cohabitation in this state after the second
marriage constitutes the commission of the crime of bigamy."); N.Y. Crim. Proc. Law §
20.40(4)(b) ("An offense of bigamy may be prosecuted either in the county in which such offense
was committed or in (i) any county in which bigamous cohabitation subsequently occurred.");
N.C. Gen. Stat. § 14-183 ("If any person, being married, shall contract a marriage with any other
person outside of this State, which marriage would be punishable as bigamous if contracted
within this State, and shall thereafter cohabit with such person in this State, he shall be guilty of a
felony and shall be punished as in cases of bigamy."); Okla. Stat. tit. 22, § 746 ("[W]hen the
second marriage took place out of the state, proof of that fact accompanied with proof of
cohabitation thereafter in this state, is sufficient to sustain the charge [of bigamy]."); S.D.
Codified Laws § 23A-22-16 ("[W]hen the second marriage took place out of this state, proof of
that fact, accompanied with proof of cohabitation thereafter in this state, is sufficient to sustain
the charge [of bigamy]."); Tex. Penal Code Ann. § 25.01 ("(a) An individual commits [bigamy]
if: (1) he is legally married and he: ... (B) lives with a person other than his spouse in this state
under the appearance of being married; . . . . (b) . . . 'under the appearance of being married'
means holding out that the parties are married with cohabitation and an intent to be married by
either party."); Va. Code Ann. § 18.2-362 ("If any person, being married, shall, during the life of
the husband or wife, marry another person in this Commonwealth, or if the marriage with such
other person take place out of the Commonwealth, shall thereafter cohabit with such other person
in this Commonwealth, he or she shall be guilty of a Class 4 felony."); Wis. Stat. § 944.05(1)(c)
("Whoever does any of the following is guilty of [bigamy] . . . cohabits in this state with a person
whom he or she married outside this state with knowledge that his or her own prior marriage had
not been dissolved or with knowledge that the prior marriage of the person he or she married had
not been dissolved.").

marry a second spouse elsewhere but reside with their second spouse within the state.

However, the Utah anti-bigamy law, properly understood, does not use "cohabit" in the same sense as other state bigamy prohibitions. Utah, includes as a perpetrator of this crime an individual who is married to one person while merely co-habiting, not having formally married or attempted to marry a second time. Therefore, Utah's anti-bigamy law includes the former crime of "unlawful cohabitation." This crime was first included in the Edmunds Act, 22 Stat. 30, § 3 (1882), and then in the Utah Code. It was a highly effective means of attacking Mormon polygamy.[17] The charge of "unlawful cohabitation" allowed federal and later state prosecutors to attack Mormon polygamous relationships even when they could not prove that the parties had gone through a marriage ceremony. *See* Cannon v. United States, 116 U.S. 55, 72 (1885)[18] ("[The unlawful cohabitation provision of the Edmunds Act] seeks, not only to punish bigamy and polygamy when direct proof of the existence of those relations can be made, but to prevent a man from flaunting in the face of the world the ostentation and opportunities of a bigamous household, with all the outward appearances of the continuance of the same relations which

---

[17] Section 3 of the Edmunds Act stated: "That if any male person, in a Territory ..., hereafter cohabits with more than one woman, he shall be deemed guilty of a misdemeanor." 22 Stat. 30, 31 (1882). The nearly identical Utah statute originally appeared as Title 90, § 4209. The law was subsequently renumbered, in 1917 as Title 119, § 8087; in 1933 as Ut. Code Ann. § 103-51-2 (with slight rewording); and, in 1953 as Ut. Code Ann. § 76-53-2. Section 76-53-2 was repealed together with the entire Criminal Code in 1973, and the current law, section 76-7-101, was enacted. N.B.: The original crime could be committed only by a "male person."

[18] Although Cannon v. United States was later set aside for lack of jurisdiction by 118 U.S. 355, the ruling of the Utah Territorial Court that it affirmed remained in place, United States v. Cannon, 4 Utah 122, 7 P. 369 (Utah Terr. 1885). The discussion therein remains relevant if not authoritative. *See* State v. Barlow, 153 P.2d 647, 651 (Utah 1944).

19

existed before the [Edmunds Act] was passed.").

The <u>Cannon</u> Court claimed that its definition of cohabitation "ha[d] relation" to the dictionary definition, "to live together as husband and wife," but the Court did not require proof of marriage nor proof of sexual intercourse in order to sustain an unlawful cohabitation charge. <u>Id.</u> at 74.  The Utah Territorial Court went even further to ensure that Mormon polygamists could not escape the law's prohibition, holding that not even proof of dwelling together with a second woman in a single household was necessary to sustain an unlawful cohabitation charge.  <u>United States v. Snow</u>, 9 P.2d 501, 504-05 (Utah Terr. 1886) (noting that the term "cohabitation" should be given a "broad meaning" in accord with the "spirit and general intent" of the Edmunds Act).[19]

In 1944, the Utah Supreme Court relied on the United States Supreme Court's discussion in <u>Cannon</u> to interpret the meaning of the term "co-habit" in Utah's unlawful co-habitation prohibition.  <u>Barlow</u>, 153 P.2d at 651-52.  The <u>Barlow</u> Court concluded that the <u>Cannon</u> Court's interpretation was "but the dictionary definition," "to live together as husband and wife."  <u>Id.</u> at 651.[20]  However, the <u>Barlow</u> Court understood this definition to apply to individuals not alleged

---

[19] Professor Linford has pointed out that this broad construction allowed polygamists virtually no recourse against unlawful cohabitation prosecutions, since divorce from an invalid marriage was impossible and moving out of the house and abstaining from sexual relations was equally futile.  Linford, <u>Polygamy Cases – Part I</u>, at 366-67; <i>see also</i> <u>United States v. Peay</u>, 14 P. 342, 346-47 (Utah Terr. 1887) (rejecting defendant's claim that he did not understand how to avoid violating the unlawful cohabitation prohibition); Firmage & Mangrum, <u>Zion</u>, at 176-77 (noting that "because the boundaries of legally permissible conduct had been left undefined, any contact [with their families] potentially left polygamists open to prosecution [for unlawful cohabitation]").

[20] "To live together as husband and wife" is a euphemism from another era connoting two people of opposite gender living in the same household in a sexual relationship.  However,

to have undergone a state-recognized marriage ceremony nor to have engaged in sexual intercourse. Id. at 649. The Barlow Court's acceptance of the idea that the unlawful cohabitation statute applied to individuals who continue to believe in the Mormon Church's former plural marriage doctrine seemed to stem from the Court's awareness of the statute's history and intent, not from any careful consideration of whether such "plural marriages" fit the "dictionary definition" of "cohabit." See id. at 649-51.

When the Legislature revised Utah's Criminal Code in 1973, it evidently considered it unnecessary to continue to list unlawful cohabitation as a separate crime; however, the continued inclusion of the word "cohabit" in Ut. Code Ann. § 76-7-101 serves to outlaw the same behavior as the former separate unlawful cohabitation statute and has the same purpose, that is to continue the direct attack on religious polygamy. That Utah is the only state to outlaw as "bigamy" mere cohabitation between parties who have not undergone a state-approved marriage ceremony and who may not be in a sexual relationship reinforces this conclusion.

ii.      Utah's anti-bigamy law can not withstand strict scrutiny because it is not narrowly tailored to further the state's compelling interest in criminalizing polygamy as it outlaws non-fraudulent relationships that do not defraud their partners or make claims to state benefits.

Legislation that is not neutral toward religion is subject to "strict scrutiny." Lukumi, 508

---

the definition of a crime should not be based upon a euphemism which  may not be understood by all.
        Adding further vagueness to the phrase, even today some legal husbands and wives live together in the same household in asexual relationships.  Is that the "living together as husband and wife" referred to in the construction and application of Utah's bigamy statute?

U.S. 531.  To be found constitutional, the regulation must be narrowly tailored to further a compelling state interest.  Id.  The state has a compelling interest in preventing individuals from defrauding their marriage partners and in regulating access to government benefits that accrue as a result of state-sanctioned "marriage."[21]  However, Ut. Code Ann. §76-7-101 is not narrowly tailored to further this interest.  The inclusion of the term "co-habit" means the statute outlaws behavior that has no connection to these interests.  An individual who is separated or in the process of divorce and shares a home with another partner violates the statute.  The statute also applies to a married individual who lives with more than one partner for non-religious reasons when all are voluntary adult participants.  In neither situation are the participants defrauding their partners or accruing state benefits but their acts are prohibited by the law.  Therefore, Ut. Code Ann. §76-7-101 is not narrowly tailored to further a compelling state interest.

B.    Utah's anti-bigamy law is unconstitutional as it prohibits a person's right to association absent a compelling state interest.

Under the First Amendment, a person has a constitutional right to association.  U.S. Const., Amend. 1.  The state may restrict a person's freedom of association only if justified by a compelling state interest.  Lukumi, 508 U.S. 531.  Utah's Anti-Bigamy law is unconstitutional as

---

[21]  In Potter v. Murray, 760 F.2d 1065 (10th Cir. 1985), the Tenth Circuit Court of Appeals recognized a compelling state interest in maintaining monogamy as "the bedrock upon which our culture is built."  Id. at 1070.  This interest may justify a State policy of extending legal recognition only to monogamous unions.  However, the State cannot defend its criminalization of religious polygamy on this basis when other manifestations of non-monogamy, such as "free love" communes, or sexual relations by an unmarried adult with a series of other unmarried adults, would not be subject to Utah's anti-bigamy law.  Like the ordinance struck down in Lukumi, the Utah law is both underinclusive and overinclusive in this regard.

22

it restricts a fundamental right to intimate personal association absent a compelling state interest.

i.      Polygamy is protected by the First Amendment as a fundamental right to association.

The choice to cohabit with one's plural wives (or the mothers of one's children) should be protected under an individual's freedom of intimate association as well as under the Free Exercise Clause. The United States Supreme Court has recognized that the Bill of Rights "must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State." Roberts v. U.S. Jaycees, 468 U.S. 609, 618 (1984). The Court characterized the types of relationships that require such protection as "involv[ing] deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life" and as "distinguished by 'a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship.'" Id. at 619-20. On the "spectrum from the most intimate to the most attenuated of personal attachments," the religious polygamists' attachment to those with whom they associate in plural marriage are surely as intimate as in any family relationship. Id. at 620. As a person has a fundamental right to association, any abridgments of that freedom must be justified by a compelling state interest.

ii.     Utah has no compelling state interest to justify the prohibition of polygamy.

The State of Utah can provide no compelling state interest to justify the prohibition of polygamy. First, although the state does have a concern with the state recognized legal status of

marriage, it does not automatically have a compelling interest as to plural marriage. The religious practice of plural marriage is distinct from the state recognized legal relationship. The former is a purely religious practice while the latter is a state recognized institution.[22] The state does not automatically have a concern in the religious institution of polygamous marriage just because it has a legitimate concern in the state recognized legal institution of monogamous marriage. The Utah legislature "may not devise mechanisms, overt or disguised, [which] are designed to persecute or oppress a religion or its practices." Lukumi, 508 U.S. at 547. This is exactly what the Utah Legislature has done. It does not have a compelling interest in the religious institution of polygamous marriage merely because it has a concern in the state institution of monogamous marriage.

In a recent appellate brief in the criminal appeal, Utah v. Thomas Arthur Green, Utah Supreme Court, Case No. 20010788-SC, the State of Utah presented four (4) justifications for Utah's statutory ban on polygamy. Appellee's Brief, June 11, 2003, pp. 33 - 38. Those four (4) reasons were: 1) American culture is based on monogamy and our legislative bodies have enacted many laws (inheritance, dependency, etc.) based upon that institution; 2) A disproportionately high percentage of polygamous families rely on public assistance; polygamists have significantly more children than monogamists; 3) The practice of polygamy may engender social problems not as prevalent with monogamy (this assertion was based upon a study of Muslim Bedouin Arab polygamists); and, 4) Women and young girls may be exploited in

---

[22] Plaintiffs in this case challenge Utah's criminalization of an intimate personal relationship and that the defendant and the State of Utah will not grant a license for a second marriage.

24

polygamist relationships.  Id.

Utah's articulation of state interests to justify making religious polygamy a crime is a

recent exercise.  In Potter v. Murray City, 760 F.2d 1065, 1069, n.5 (10th Cir. 1985), the State of

Utah acknowledged

> because Congress in Utah's Enabling Act required Utah to prohibit polygamy, there is "no
> indication whatsoever that the Utah Legislature has ever, since statehood was achieved in
> 1896, attempted to make the fundamentally sociological judgment of whether or not
> monogamous marriage is empirically superior to polygamy."  II R. 359-60.  In addition,
> counsel for the State of Utah stated that:
>
>> As nearly as I can determine at this point, Utah has never seriously
>> considered on a policy basis whether these particular laws [prohibiting
>> polygamy] are wise or not.  Utah has not had occasion, because of the
>> federal mandate reflected in the Constitution, to give public policy
>> consideration to these particular issues.  Utah has followed without
>> question, as near as I can determine, the mandate of the federal
>> government to maintain this prohibition as a part of its price for statehood.

None of the reasons now set out are "compelling state interests" which justify the

nullification of a person's constitutional right to associate based upon a deeply held religious

belief.  The reasons the State offers to justify the legislation either are not resolved by the

criminalization of polygamy or they could be resolved by legislative measures and prosecutorial

action[23] short of a total ban on the religious practice of polygamy.

First, the fact much of American legal culture is based on monogamy does not justify a

ban on polygamy.  Utah's legislature can re-write inheritance, dependency, paternity, etc. laws to

_____

[23] Polygamist that engage in incest, statutory rape, child abuse, welfare fraud, or other
crimes should be punished to the full extent of the law (as should be unmarried persons and
monogamists that engage in such crimes.)

accommodate polygamy.  The oddity of or a general disdain for religious based polygamy are not compelling state interests to ban the practice.

Second, that polygamist families might have high numbers that rely on public assistance and might have more children than monogamists does not justify a total ban on polygamy.  Other religious and ethnic groups who have also been accused of having too many children or having a disproportionately high welfare dependency (*e.g.*, Catholics, Irish, Mexicans, African-Americans, Mormons) have not suffered a legislative attack on their culture or beliefs.  Utah can not and will not enact a law of general application restricting the number of children a woman can bear. People unable to procreate are barred from polygamous marriages.[24]  Well-to-do people who will never seek public assistance can not enter into plural marriages.

Third, that some study found Muslim polygamy may engender social problems does not justify a ban.  Social problems are not limited to polygamists.  Baptist, Mormon, Jewish, single parent, and monogamist families also have social problems.  No evidence establishes that polygamists are more prone to social problems than any other group.

Fourth, the fact that women and girls may be exploited in polygamous relationships does not justify a total ban.  The State of Utah does not protect women or young girls in all exploitative relationships.  Women (and men) enter into exploitative relationships on a daily basis (economic, religious, social, etc.).  No legitimate reason exists to single out women that

---

[24] Ut. Code Ann. § 30-1-1 (2)(1953 as amended) allows incestuous and otherwise criminal marriages of first cousins over the age of 65, or if both parties are over 55, when a state court judge determines either party is unable to reproduce.

may be exploited by polygamy for protection by the state.  Utah does not outlaw ISKCON (the "Hare Krishnas"), the Unification Church (followers of the Rev. Sun Myung Moon, the "Moonies") or other religious groups which have been accused of being exploitative nor legislatively attack any tenet of those faiths.  Neither does the state regulate exploitative relationships between a single man and a single woman or monogamous men and women.

Finally, the Utah statute directly infringes on the religious practice of "plural marriage" when such practice has no more impact on state interests than does the non-religious practice of multiple girlfriends or cohabitation by consenting, unmarried adults.  In Lukumi, the Court recognized "[t]he proffered objectives [of the legislation] were not pursued with respect to analogous non-religious conduct."  Lukumi, 508 U.S. at 546.  This is what is presented here.  The State criminalizes predominately religious practices.  If the State does have a compelling interest to regulate "co-habitation," it must regulate equally the religious and non-religious practice by both "married" and unmarried participants.

III.    EVEN IF IT WERE NEUTRAL, UTAH CODE ANN. § 76-7-101 IS UNCONSTITUTIONAL BECAUSE ITS SIMULTANEOUSLY VIOLATES THE RIGHT TO THE FREE EXERCISE OF RELIGION AND THE RIGHT TO ASSOCIATION.

In Employment Division v. Smith, 494 U.S. 872 (1990), practitioners of a Native American religion asked the Court to apply strict scrutiny to a statute punishing them for the religious use of peyote.  Not only did the Court refuse to create the accommodation, it ruled that "the right of free exercise [of religion] does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability,' " Smith, 494 U.S. at 879 (quoting United

27

States v. Lee, 455 U.S. 252, 263 n. 3 (1982) (Stevens, J., concurring)), and that such a law need

not be justified by a compelling interest even where religious practice is substantially burdened,

id. at 888-89.  In effect, Smith created a "safe harbor" – if the law is "a valid and neutral law of

general applicability," then it must simply be rationally related to a legitimate government end.

However, in Smith, the Supreme Court noted the difference between cases solely involv-

ing the Free Exercise Clause and those simultaneously implicating additional constitutional

protections.  494 U.S. at 881.  By way of example, the Court quoted a passage from Wisconsin v.

Yoder, 406 U.S. 205, 233 (1972), which states the proposition that when the interests of

parenthood are combined with a free exercise claim "of the nature revealed by this record," the

government must establish more than a mere reasonable relationship between its law and a

purpose within the competency of the State.  Id., 406 U.S. at 207 fn. 1.  This more-than-a-

reasonable-relationship requirement is similar to the compelling-interest test of Sherbert v.

Verner, 374 U.S. 398, 83 S.Ct. 1790, 1792-94 (1963).

The hybrid-rights theory of Smith leads to the application of the compelling interest test

in the case at bar.  The infringements on the plaintiffs' secondary rights herein are substantial,

clear and concrete.  The right to liberty and to personal association (e.g., to live in the same

household with the mothers of one's children; to maintain an intimate relationship with another

adult) combined with the free exercise right to practice one's religion (e.g., to enter into plural

marriages leading to eternal salvation) mandate the application of the Smith hybrid-rights theory

and the application of strict scrutiny to the provisions challenged in this action.

As discussed above, the challenged provisions can not withstand strict scrutiny and are

28

unconstitutional under the Smith hybrid-rights analysis.

## **CONCLUSION & RELIEF**

This court should grant summary judgment on plaintiffs' constitutional claims, because

no material facts are in dispute.  Plaintiffs sought a marriage license and defendant refused to

issue one because Utah law prohibits plural marriages.  The challenged provisions should be

declared unconstitutional as:  1) they violate plaintiffs' constitutionally protected right to privacy

in the conduct of their most intimate relationships; 2) they violate plaintiffs' constitutional right

to association; 3) the statutes are not neutral and do not survive strict scrutiny; 4) the State has no

compelling state interest in restricting plaintiffs' constitutionally protected rights; 5) the statutes

violate plaintiffs' right to freely practice their religion and simultaneously their right to

association; and, 6) the offending laws stigmatize plaintiffs as criminals because of their religious

based choice of marital relationship.

Dated this 23rd day of APRIL 2004.

UTAH LEGAL CLINIC
Attorneys for Plaintiffs

By _____
BRIAN M. BARNARD

## CERTIFICATE OF MAILING

I hereby certify that I caused to be mailed a true and correct copy of the foregoing

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

to:

JULIE V. LUND
MARK SHURTLEFF
JERROLD S. JENSEN
UTAH ATTORNEY GENERAL'S OFFICE
STATE AGENCY COUNSEL
Attorneys for Defendant
160 East 300 South Street    5TH FLR
P O BOX 140857                              **FAX:  (801) 366-0352**
SALT LAKE CITY, UT, 84114-0857

on the 23rd day of APRIL 2004, postage prepaid in the United States Postal Service.

UTAH LEGAL CLINIC
Attorneys for Plaintiffs

By
BRIAN M. BARNARD