REC'D

JERROLD S. JENSEN (#1678) BY
JULIE V. LUND (#4875)
Assistant Attorneys General
MARK L. SHURTLEFF (#4666)
Attorney General
Attorney for Defendant
160 East 300 South, 5th Floor
P.O. Box 140857
Salt Lake City, Utah  84114-0857
Telephone:  (801) 366-0353

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

|  |  |
|---|---|
| J. BRONSON, G. LEE COOK and D. COOK, <br><br> Plaintiffs, <br><br> v. <br><br> SHERRIE SWENSEN, in her official capacity as Salt Lake County Clerk, <br><br> Defendant. | **MEMORANDUM  IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 02-04CV-00021 <br><br> Judge Ted Stewart |

Defendant Sherrie Swensen, by and through counsel, submits the following

Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment.

## INTRODUCTION

Plaintiffs assert that the criminalization of polygamy is an unconstitutional restriction of

their right to conduct personal and intimate relationships free from all state intrusion.  The

20

statutes they seek to set aside are: (1) The Utah Enabling Act passed by Congress in 1894

authorizing the people of Utah to form a constitution and state government, and directing that

that constitution include a provision stating "that polygamist or plural marriages are forever

prohibited." Act of July 16 1894, ch. 138, 28 stat. 107, 108, (2) Article III of the Utah

Constitution which states that "polygamous or plural marriages are forever prohibited,"

and, (3) Utah Code Ann. § 76-7-101 criminalizing bigamy.

This case may be resolved as a matter of law as there are no material issues of fact in

substantial dispute.

## I.   PLAINTIFFS' LACK STANDING TO CHALLENGE THE CONSTITUTIONALITY OF UTAH'S BIGAMY STATUTE.

Plaintiffs' complaint is directed at the conduct of Sherrie Swensen, the Salt Lake County

Clerk, and her deputies.  Plaintiffs G. Lee Cook and J. Bronson allege that the denial of their

request for a marriage license on the basis that G. Lee Cook was legally married to D. Cook

violated their constitutional rights.  Swensen and her clerks are mandated by Utah law not to

issue a marriage license to a person who is already legally married.[1]

---

[1]Utah Code Ann. § 30-1-16 states:
   **Misconduct of county clerk – Penalty.**
   Every clerk or deputy clerk who knowingly issues a license for any
   prohibited marriage shall be punished by confinement in the state
   prison for a term not exceeding two years, or by fine in any sum
   not exceeding $1,000, or by both such fine and imprisonment, and
   upon conviction shall be removed from his office by the judgment
   of the court before which his conviction is had; and if he willfully

2

Plaintiffs have not been charged with violating Utah Code Ann. § 76-7-101.  As such, they lack standing to challenge the constitutionality of that statute.  Plaintiffs G. Lee Cook and J. Bronson do not claim to be married and therefore are not currently in violation of the statute.

Standing is a threshold issue.  Keyes v. School District No. 1, 119 F.3d 1437, 1445 (10th Cir. 1997); Oliverson v. West Valley City, 875 F. Supp. 1465, 1470 (D. Utah 1994).  It is part of the constitutional requirement of case or controversy.  U.S. Const. Art. III, § 2.  Plaintiffs' "must maintain standing at all times during the litigation for a court to retain jurisdiction."  Powder River Basin Resources Council v. Babbitt, 54 F. 3d 1477 (10th Cir. 1995).  The facts of standing are determined by the facts at the time the challenge is made.  Oliverson, 875 F. Supp at 1470 (citing Yancy v. American Petrofina Inc. 768 F.2d 707 (5th Cir. 1985)).

The basic elements of standing were summarized by the U.S. Supreme Court in Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992):

> Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements: First, the Plaintiffs must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and

---

> issues a license contrary to his duty as herein prescribed, he shall be fined not exceeding $1,000.
>
> Utah Code Ann. § 30-1-2 states:
> **Marriages prohibited and void.**
> The following marriages are prohibited and declared void:
>   (1) when there is a husband or wife living, from whom the person marrying has not been divorced;
> * * *

3

particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be "fairly... trace[able] to the challenged action of the defendant, and not ... the result [of] the independent action of some third party not before the court." Third, it must be "likely", as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

Id. at 560.  Possible future injury is insufficient to create standing. Lujan, 504 U.S. at 560 -61. The burden is on the Plaintiffs to show that they have the requisite standing.  State of Utah v. Babbitt, 137 F. 3d 1193, 1202 (citing United States v. Hays, 515 U.S. 737, 743 (1995)).  Where criminal statutes are involved, the court does not consider extraordinary hypotheticals.  United States v. Mendes, 912 F.2d 434, 441 (10th Cir. 1990).

    A.    **Plaintiffs have not suffered, and are not likely to suffer, an injury in fact.**

    Plaintiffs assert in their memorandum that Utah Code Ann. § 76-7-101, which criminalizes bigamy, infringes on their constitutional rights to privacy, freedom of association and freedom of religion.  These arguments must fail.  Injury in fact, requires a "factual showing of perceptible harm" by the Plaintiffs. Lujan, 504 U.S. at 566.  The injury must be concrete rather than hypothetical.  State of Utah v. Babbitt, 137 F.3d 1193, 1201-02 (10th Cir. 1998).  The status of the Plaintiffs to the claims they are asserting is critical.  Citizens may not use the courts as forums for the resolution of constitutional questions that do not effect their individual rights or interests.  Oliverson, 875 F. Supp. at 1470 (citing Allen v. Wright, 468 U.S. 737(1984) and Valley Forge Christian College v. Americans United for the Separation of Church and State, 454

4

U.S. 464, 475(1982)).

Plaintiffs in this case have not been charged under this criminal statute nor have they been threatened with prosecution. They sought a marriage license and were denied. They cannot establish an injury in fact arising from the defendant's conduct.

**B.** **Plaintiffs cannot trace their alleged harm to the denial of a marriage license.**

The second prong of the Lujan analysis requires a causal connection between the injury and the conduct complained of - "the injury has to be 'fairly traceable to the challenged action of the defendant, and not /.... th[e] result [of] the independent action of some third party not before the court." Lujan, 504 U.S. at 560. The Salt Lake County Clerk is the sole defendant in this case. She has no authority to criminally charge or prosecute violations of the statute challenged in Plaintiffs' memorandum. There is no impingement on their claimed constitutional right to engage in their most intimate relationships. The only injury which can be directly traced to the defendant is the failure of the state to issue a license for a plural marriage.

**C.** **A favorable decision will not redress Plaintiffs' alleged injury**.

The final prong of the Lujan analysis requires the Plaintiffs to demonstrate that a favorable ruling would redress their injury. The court must find that it would be "likely as opposed to merely speculative that the injury would be redressed by a favorable decision." Lujan, 504 U.S. at 560-61. Here, the Plaintiffs "seek an end to the criminalization of the practice of religious polygamy". (Preliminary Statement of Plaintiffs Memorandum in Support of Motion

for Summary Judgment ¶ 3).  The injuries they allege are a violation of their privacy, a fear of prosecution, stigmatization as criminals and a restriction on their right to freely associate.  They have not demonstrated how the conduct of the Salt Lake County Clerk has caused these alleged injuries or how this action could redress them.

The Plaintiffs' cannot meet the requirements of the <u>Lujan</u> analysis to demonstrate that they have standing to challenge the constitutionality of the criminal statute which bans polygamy in Utah.  There is no injury in fact, the conduct of the Defendant is not related in any way to the harms alleged by the Plaintiffs and a favorable decision in this matter will not redress their alleged injuries.  Plaintiffs' Motion for Summary Judgment should be denied as it goes far beyond the scope of their complaint.

## II. <u>LAWRENCE V. TEXAS</u> DOES NOT PROVIDE A LEGAL BASIS FOR THE LEGALIZATION OF PLURAL MARRIAGE.

Plaintiffs' Memorandum in Support of their Motion for Summary Judgment focuses on the criminalization of polygamy and relies to great extent on the recently decided United States Supreme Court case of <u>Lawrence v. Texas</u>, 123 S. Ct. 2472 (2003).  Their reliance on that decision in support of their claim for a constitutional right to plural marriage is misplaced. <u>Lawrence</u> grants consenting adults the right to engage in private conduct protected by the due process clause of the Fourteenth Amendment.  It does not grant legal recognition to any personal relationships.

<u>Lawrence v. Texas</u> was heard by the United States Supreme Court pursuant to a writ of

6

certiorari challenging the Texas anti-sodomy statute.  That statute made it a crime for two persons of the same sex to engage in certain intimate sexual conduct.  The petition was based upon the due process and equal protection clauses and their constitutional rights of privacy.  Id. at 2476.  The Court ruled that the petitioners were free as consenting adults to engage in private conduct protected by the due process clause of the Fourteenth Amendment.  Id. at 2483.  However, the Court was very clear in stating what the case did not do.  It did not involve minors, sexual conduct in public, prostitution, and, the Court noted  it did "not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter."  Id. at  2484.

There is a difference between the private exercise of sexual activity and the legal recognition of marriage by the state.  The two are not synonymous and the finding by the Lawrence court of a liberty interest in private sexual conduct does not thereby open the flood gates allowing incestuous marriages, marriages between cousins, marriages between children, marriage to an underage child, or marriages between persons of the same sex.

The Lawrence decision recognizes that certain sexual contact is essential to an intimate relationship and a protected liberty.   The Texas statute which was overturned by Lawrence had criminalized private sexual conduct between two consenting adults of the same gender.  The case turned upon the fact that the prohibited conduct was sexual behavior which had occurred in the privacy of a home. Id. at 2478.  As the Court noted, persons have a liberty interest in engaging in

7

relationships without the state interfering in the "meaning of the relationship" or setting its boundaries absent injury to a person or abuse of an institution the law protects.  Id.

Marriage, however, is a legal relationship sanctioned by the state, and regulated by the state.  Admittedly, the power to regulate is not unlimited.  A constitutionally recognized right of privacy protects parties to a marriage from unwarranted state intrusion into and regulation of their relationship.  Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed. 2d 510 (1965).  Reasonable regulations which do not significantly interfere with decisions to enter into the marital relationship may be legitimately imposed.  Zablocki v. Redhail, 434 U.S. 374, 98 S.Ct. 673, 54 L. Ed. 2d 618 (1978).

The state's refusal to recognize plural marriage is not the same as a violation of individual privacy.   The Plaintiffs herein, as consenting adults, are at liberty to engage in whatever sexual activities they deem appropriate within the confines of their home or other private place.  That is not the same as saying that the state, under the Lawrence decision, must grant the parties a license giving state recognition to their plural marriage.  Those two concepts are not the same, and the Supreme Court explicitly noted it in the Lawrence decision.  123 S.Ct. 2484.

## III.   REYNOLDS V. UNITED STATES REMAINS THE LAW OF THE LAND AND IS DISPOSITIVE OF THIS CASE.

The issues raised in the present case were also raised over 125 ago in Reynolds v. United

States, 98 U.S. 145 (1878).  Plaintiffs seek to overturn this case. George Reynolds, an early Mormon polygamist living in the Territory of Utah, was convicted under the Morrill Antibigamy Act, Ch. 126, 12 Stat.501 (1862), which prohibited bigamy in all territories of the United States. Reynolds, 98 U.S. at 146-51.  At trial, Reynolds adduced evidence that he and other members of his church practiced polygamy as an essential tenet of their religion.  They believed that if they did not practice polygamy they would suffer "damnation in the life to come." Id. at 161-162.

The Reynolds court upheld the conviction, finding that the Free Exercise Clause does not require the government to grant religious exceptions to general criminal statutes, as long as the subject of the regulation falls within the legitimate exercise of legislative authority.  Id. at 162-67.  The Reynolds court held that marriage was clearly an area properly regulated by the legislature.  Id. at 166.  Although a "sacred obligation," marriage is essentially a "civil contract" upon which "society may be said to be built" and out of which "spring social relations and social obligations and duties, with which government is necessarily required to deal." Id. at 165. Indeed, marriage is such an "important feature of social life," that the court found it "impossible to believe that the constitutional guaranty of religious freedom was intended to prohibit legislation" regulating marriage.  Id.  Consequently, "unless restricted by some form of constitution, it is within the legitimate scope of power of every civil government to determine whether polygamy or monogamy shall be the law of social life under its dominion."  Id. at 166.

The Reynolds court proceeded to recognize that American states, like their European predecessors, exercised legitimate legislative authority to determine that monogamy, not polygamy, would constitute their basic social unit. Id. at 165-66.  The court recognized that just as early English courts had severely punished polygamy " there has never been a time in any State of the Union when polygamy has not been an offence against society, cognizable by the civil courts and punishable with more or less severity. Id.

Having decided that the federal bigamy statue was a legitimate exercise of legislative power, the Reynolds court turned to whether the Free Exercise Clause required Congress to exclude "those who make polygamy a part of their religion .... from the operation of the statute." Id. at 166.  The court noted that allowing religious exceptions to general criminal statutes would create a number of problems.  First, requiring religiously motivated exceptions would result in unequal application of general criminal statutes because, "those who do not make polygamy a part of their religious belief may be found guilty and punished, while those who do, must be acquitted and go free." Id.  The Court went on to state that while the Free Exercise Clause protected "mere religious belief and opinions" from regulation, it did not prohibit regulation of socially harmful conduct, even though that conduct might be based on sincerely held religious beliefs. Id.  Finally, the court concluded that permitting religious exemptions to a criminal law, "would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself.  Government could exist only in

10

name under such circumstances." Id. at 166-67.

The Supreme Court ultimately concluded that the Free Exercise Clause of the United States Constitution did not entitle Mr. Reynolds to a religious exception to the federal bigamy statute. This rule, with some modifications, still applies today.

## IV.    CURRENT APPLICATION OF THE REYNOLDS RULE.

For a period from 1963 to 1990, the Supreme Court deviated from Reynolds' general rule by requiring states to demonstrate a narrowly-tailored "compelling state interest" when a general statute arguably burdened a religious belief. *See, e.g.,* Sherbert v. Verner, 374 U.S. 398 (1963) (state did not have compelling interest in denying unemployment benefits to worker who could not find a job because she refused to work on her Sabbath day); Wisconsin v. Yoder, 406 U.S. 205, 219-20 (1972) (Free Exercise Clause required state to exempt Amish from compulsory education laws where state could not show compelling state interest); *but see* United States v. Lee, 455 U.S. 252 (1982) (ostensibly applying compelling state interest test to reject Amish employer's free exercise claim to exemption from Social Security taxation); Goldman v. Weinberger, 475 U.S. 503 (1986) (applying "far more deferential" review in free exercise challenge to military regulations prohibiting wearing of yarmulke with uniform).

In 1990, however, the Supreme Court reaffirmed Reynold's general holding in Employment Div., Dept. of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990). The plaintiffs in Smith were fired from their jobs as drug counselors when they used peyote for

11

sacramental purposes in a ceremony of the Native American Church, of which they both were members. Id. at 874-75. The two men were denied unemployment benefits because Oregon law made ingesting peyote a crime, whether or not religiously motivated. Id. at 875.

The question presented in Smith was whether the Free Exercise Clause required Oregon to exempt religiously motivated users of peyote from its general criminal statute. Id. at 876-78. In response, the Supreme Court reiterated its holding in Reynolds:

> We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate. . . . We first had occasion to assert that principle in *Reynolds v. United States*, where we rejected the claim that criminal laws against polygamy could not be constitutionally applied to those whose religion commanded the practice.

Id. at 878-79. Just as Reynolds had before it, Smith recognized that "'[t]o permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself.'" Id. at 879 (quoting Reynolds, 98 U.S. at 166-67).

The Smith majority also recognized that "government's ability to enforce generally applicable prohibitions of socially harmful conduct . . . 'cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development.'" Id. at 885 (quoting Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 451 (1988)). Thus, the court held, "valid and neutral statutes of general applicability" need not be justified by a

12

compelling state interest, even though the statutes may incidentally burden a religious practice. Id. at 879-80, 882-88.

In <u>Church of the Lukumi Babalu Aye, Inc. v. Hialeah</u>, 508 U.S. 520, (1993), the Supreme Court applied <u>Smith's</u> general rule to invalidate a series of city ordinances prohibiting animal sacrifice.  The ordinances were passed only after the city council learned that members of the Santeria religion planned to establish a church in the city and, consistent with their core religious beliefs, sacrifice small animals.  Id. at 524-25.  Before adopting the first ordinance, the council passed a resolution expressing residents' "concern that certain religions may propose to engage in practices which are inconsistent with public morals, peace or safety."  Id. at 526, 548.  In the ensuing months, the city council passed five ordinances that banned animal sacrifice in the city. Id. at 526-30, 548-57.  The ordinances contained so many exceptions that, in effect, they applied only to the religious sacrifice of animals by Santerians.  Id. at 533-37.

The Supreme Court invalidated the ordinances under the Free Exercise Clause because they were neither neutral nor generally applicable, and the city had not demonstrated a narrowly tailored compelling governmental interest in banning religious animal sacrifices.  Id. at 531-40, 542-47.  In reaching this holding, the court set out the test for determining neutrality and general applicability.

### A.      Neutrality.

According to <u>Lukumi</u>, a law is not neutral if its object "is to infringe upon or restrict

13

practices *because of their religious motivation . . .*" or if the law targets "religious conduct for distinctive treatment." Id. at 533-34 (emphasis added). In other words, the law may not target conduct merely because of its religious motivation.

Determining the object of a law, "begin[s] with its text, for the minimum requirement of neutrality is that a law not discriminate on its face." Id. at 533. "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." Id.

Facial neutrality, however, does not end the inquiry, because a statute that appears facially neutral may still impermissibly target religious conduct in its practical effect. Id. at 534-35. Thus, a court assessing the neutrality of a law must also look at "the effect of a law in its real operation." Id. at 535. An "adverse impact" on religion does not by itself prove "impermissible targeting." Id. This is because "a social harm may have been a legitimate concern of government for reasons quite apart from discrimination." Id. (citing to McGowan v. Maryland, 366 U.S. 420, 422 (1961) and Reynolds, 98 U.S. 145). Thus, the key inquiry for determining whether a statute is neutral in its operation is not whether it adversely affects religion, but whether it defines categories in such a way so as to treat religion unfairly. Id. at 534.

The Lukumi court concluded that although the ordinances were technically neutral on their face, they were not neutral in their operation, because they effectively accomplished a "religious gerrymander" that ensured "few if any killings of animals [were] prohibited other than

14

Santeria sacrifice . . . ." Id. at 536. "Indeed," the court noted, "careful drafting ensured that, although Santeria sacrifice is prohibited, killings that are no more necessary or humane in almost all other circumstances are unpunished." Id.

Significantly, the Lukumi majority did not assess neutrality by considering the legislative body's subjective intent. Although the author, Justice Kennedy, and one other justice would have also considered historical and legislative background in determining the object of the ordinances, Id. at 522, 540-42, the other seven justices did not join that part of the opinion (II.A.2), and two of them expressly disavowed it. Id. at 523, and at 557-58 (Scalia, J. concurring). Justice Scalia, joined by Chief Justice Rehnquist, wrote that he did not join that section because it

> departs from the opinion's general focus on the object of the *laws* at issue to
> consider the subjective motivation of the *lawmakers, i.e.,* whether the Hialeah
> City Council actually *intended* to disfavor the religion of Santeria. As I have
> noted elsewhere, it is virtually impossible to determine the singular 'motive' of a
> collective legislative body, and this Court has a long tradition of refraining from
> such inquiries."

Id. at 558 (emphasis in original) (internal citations omitted).

In short, the Lukumi majority examined neutrality based only on the objective criteria of the law's language and the law's practical effect. It did not take into account the subjective motives of the legislative body in enacting the law.

**B.      General applicability.**

Lukumi explained that the principle underlying the general applicability requirement is

that "government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief." Id. at 543.  Lukumi did not "define with precision the standard used to evaluate whether a prohibition is of general application," but did emphasize the ordinances' underinclusiveness in carrying out their stated objectives. Id. at 543-44.  Only the religious conduct of Santerians was required to bear the burden of the ordinances, while similar secular conduct was exempt from the ordinances. Id. at 543-46.  As a result, the ordinances treated religious observers differently from nonreligious observers.[2]

Relying on Lukumi, Plaintiffs argue that Utah's bigamy statute is not neutral because it specifically targets religious polygamy.  Consequently, they contend that the State must demonstrate a compelling government interest in not exempting religious polygamy.  In claiming that Utah's bigamy statute lacks neutrality, Plaintiffs refer to 19th century federal anti-bigamy statutes.  They allege that because these statutes were enacted in direct response to the practice of plural marriage by Mormons, they represented the same type of impermissible religious targeting addressed in Lukumi. Id.   They contend that this religious targeting

----

[2]Although Lukumi purports to draw a clear distinction between "neutrality" and "general applicability," there appears to be little practical difference between those terms as defined by the majority. Justice Scalia thought it unnecessary "to make a clear distinction" between the two terms because they "substantially overlap." Lukumi, at 557 (Scalia, J., concurring).  However, if Justice Scalia were to make a distinction, it would be that "the defect of lack of neutrality applies primarily to those laws that *by their terms* impose disabilities on the basis of religion . . .; whereas the defect of lack of general applicability applies primarily to those laws which, though neutral in their terms, through their design, construction, or enforcement target the practices of a particular religion for discriminatory treatment." Id. at 557 (emphasis in original) (citations omitted).

continued through Utah's Enabling Act, which conditioned statehood on banning polygamy "forever," and through Utah's subsequent anti-polygamy statutes, which were enacted only to achieve statehood.  Id.   Plaintiffs conclude that Utah's current bigamy statute is a direct product of these earlier statutes and therefore  "carries on the historical targeting of religious polygamy for special sanction."

Plaintiffs' neutrality argument rests on two mistaken assumptions:  (1) that 19th century federal anti-bigamy laws targeted only religious polygamy, and (2) that Utah's current statute directly descends from those laws and thereby continues any impermissible targeting.  Even accepting *arguendo* the validity of those assumptions, their neutrality argument improperly focuses on the subjective motives of a legislative body that did not even enact the statute at issue here.  As Lukumi held, the proper focus is on the language and the effect of the challenged statute "in its real operation," not on the subjective motives of lawmakers.  *See* Lukumi, 508 U.S. at 535.  Under that test, Utah's bigamy statute is clearly neutral.

Plaintiffs argument that the federal government passed anti-polygamy legislation in response to Mormon polygamy is correct.  In 1852, the Mormon Church publicly announced that it members practiced polygamy because of their religious beliefs.  Richard S. Van Wagoner, *Mormon Polygamy: A History* 83-86 (1989).  At the time, no federal law prohibited bigamy, although as noted by Reynolds, every state prohibited the practice.  Id. at 105; Reynolds, 98 U.S. at 165-66.  The American public viewed the practice, not only as violative of God's laws, but

17

also as an evil that "would result in genetic abnormalities" and lead to "political despotism." Van Wagoner, at 105-06.

In 1862, Congress passed the Morrill Anti-bigamy Act, the statute at issue in <u>Reynolds</u>. <u>Id</u>. The intent of the Act was to "punish and prevent the practice of polygamy in the Territories of the United States and to disapprove and annul certain acts of the territorial legislature of Utah." <u>Id</u>. at 107. Despite the Morrill Act, Mormons continued to practice polygamy. <u>Id</u>. at 108-117. In 1883, Congress passed the Edmunds Act, which amended the Morrill Anti-bigamy Act to also prohibit "unlawful cohabitation," a crime which was easier to prove than bigamy. <u>Id</u>. at 117. The Edmunds Act also disenfranchised polygamists, making them ineligible for public office and jury duty. <u>Id</u>.

When the Mormons continued to practice polygamy, Congress passed the Edmunds-Tucker Act in 1887. <u>Id</u>. at 130. This Act made unrecorded marriages felonies, forced wives to testify against husbands, disinherited children of polygamous marriages, abolished female suffrage, disenfranchised polygamists, disincorporated the Mormon Church, and confiscated all church property in excess of $50,000. <u>Id</u>. at 133. Ultimately, the Mormon Church officially discontinued the practice of polygamy so that it could obtain statehood. <u>Id</u>. at 133-40, 153-57.

Plaintiffs argue that the foregoing history proves that Congress's object in passing anti-polygamy legislation was "to infringe upon or restrict" the practice of polygamy solely "because of [its] religious motivation." <u>Lukumi</u>, 508 U.S. at 533-34. That assumption is unfounded.

18

While it is true that the 19th century anti-bigamy laws were passed in direct response to Mormon polygamy and for the purpose of forcing Mormons to abandon the practice, it does not necessarily follow that those laws targeted polygamy *as a religious practice*. As the Supreme Court recognized, "In many instances, the Congress or state legislatures conclude that the general welfare of society, wholly apart from any religious considerations, demands . . . regulation" of conduct "whose reason or effect merely happens to coincide or harmonize with the tenets of some or all religions." McGowan v. Maryland, 366 U.S. 420, 442 (1961). *See also* Lukumi, 508 U.S. at 535 (recognizing that "a social harm may [be] a legitimate concern of government for reasons quite apart from discrimination").

As Reynolds observed, bigamy had been prohibited in England and the United States for centuries before Mormons began practicing polygamy for religious reasons. Reynolds, 98 U.S. at 165-66. *See also* Lawrence M. Friedman, *Crimes of Mobility*, 43 Stan. L. Rev. 637, 640-41 n.13-14 (Feb. 1991) (noting that bigamy had not only been a crime in England, but "has always been outlawed in the United States"). Thus, Congress objected to polygamy not because it was a religious practice, but because it considered it to be a social ill. Congress's passage of anti-bigamy legislation merely extended to the territories of the United States what was already long-standing social policy in the states themselves. Significantly, the Morrill Antibigamy Act did not ban only religiously motivated polygamy; rather, it banned all polygamy regardless of the reason it was practiced. This suggests that if a nonreligious group had openly practiced plural marriage

19

in the territories, Congress would have still banned the practice.

However, even assuming that the federal anti-bigamy statute impermissibly targeted religious polygamy, this does not mean that Utah's current bigamy statute suffers from the same defect. Utah's bigamy statute states, "A person is guilty of bigamy when, knowing he has a husband or wife or knowing the other person has a husband or wife, the person purports to marry another person or cohabits with another person."  Utah Code Ann. § 76-7-101(1) (1999). Plaintiffs assert that the "cohabit" element "incorporates the former crime of 'unlawful cohabitation,' which was first included in the Edmunds Act, 22 Stat. 30, § 3 (1882), and then in the Utah Code, as a highly effective means of attacking Mormon polygamy."

Utah's first polygamy statute provided that a "person who has a husband or wife living, who marries another, whether married or single, and any man who simultaneously, or on the same day marries more than one person is guilty of polygamy."  Revised Statutes of Utah, § 4208 (1898); *see also* Utah Code Ann. § 76-53-1 (1953).  "Unlawful cohabitation," on the other hand, was defined as "any person [who] cohabits with more than one person of the opposite sex." Revised Statutes of Utah, § 4209 (1898); *see also* Utah Code Ann. § 76-53-2 (1953).

Plaintiffs assert that the latter statute must be the source for the element of cohabitation in Utah's current bigamy statute for two reasons: (1) Utah repealed the "unlawful cohabitation" provisions in 1973 when it enacted the current statute, and (2)  Utah includes as a perpetrator of this crime an individual who is married to one person while merely cohabiting, not having

20

formally married a second time, with another.

Although Utah did repeal the crime "unlawful cohabitation" at the same time it enacted the current bigamy statute in 1973, there is a more likely source for that statute's cohabitation element. In 1973, the legislature also repealed the prior criminal code and enacted a new one, patterned after the Model Penal Code. *See* State v. Brown, 607 P.2d 261 (Utah 1980) (noting that legislature considered Model Penal Code in drafting criminal code in 1973). The Model Penal Code drafters proposed banning both bigamy and polygamy in a single statute, but in separate subsections. MPC § 230.1. The Model Penal Code defined bigamy when "[a] married person . . . contracts or purports to contract another marriage, unless at the time of the subsequent marriage," the actor believes the prior spouse is dead or "reasonably believes that he is legally eligible to remarry." Id. The Code defined polygamy as when a person "*marries or cohabits* with more than one spouse at a time in purported exercise of the right of plural marriage." Id. (emphasis added). Although Utah did not adopt the provision as written, the language of our current bigamy statute more closely tracks the language of the Model Penal Code than that of Utah's former polygamy and unlawful cohabitation statutes.

Plaintiffs mistakenly assert that "Utah is the only state to outlaw as 'bigamy' cohabitation between parties who have undergone a state-approved marriage ceremony." In fact, at least three other states, Rhode Island, Texas, and Colorado have provisions similar to Utah's. *See* R.I. Gen. Laws § 11-6-1 (2002) ("Every person who shall be convicted of being married to another, *or of*

21

*cohabiting with another as husband and wife*, having at the time a former husband or wife living
. . . .); Tex. Code Ann. § 25.01 (Vernon 2003) ("An individual commits an offense if: (1) he is
legally married and he: . . . lives with a person other than his spouse in this state under the
appearance of being married . . . "); Colo. Rev. Stat. § 18-6-201 (1999) ("Any married person
who, while still married, *marries or cohabits* in this state with another commits bigamy . . .").
That none of these states has a history of religious polygamy suggests that their use of the cohabit
element is not merely "religious animus."  It follows that Utah's use of that element also does not
target only religiously motivated polygamy.

In short, it appears that Utah's modern bigamy statute is neither a direct descendant of
19th century federal anti-bigamy laws nor merely a product of federal hostility toward Mormon
polygamists.

Utah's modern bigamy statute is neutral under <u>Lukumi</u>'s objective criteria of facial and
operational neutrality.  Even assuming the validity of plaintiffs assumptions, their argument
improperly focuses on the subjective motives of legislative bodies convened over a 100 years
ago, while ignoring <u>Lukumi</u>'s objective tests of facial and operational neutrality.  Utah's current
bigamy statute is clearly neutral under both criteria.

*Facial neutrality.*  Utah's bigamy statute is neutral on its face.  It contains no reference
"to a religious practice without a secular meaning discernable from the language or context."
<u>Lukumi</u>, 508 U.S. at 533.  It relates to marriage, which, as <u>Reynolds</u> recognized, is a secular

matter wholly within legislative regulatory authority. <u>Reynolds</u>, 98 U.S. at 165-66. The statute does not distinguish between those who practice polygamy for religious reasons and those who marry twice for nonreligious reasons. It prohibits every married person from either formally or informally taking another spouse, irrespective of motive. Because the text of the statute targets all bigamous relationships and not just those motivated by religion, it is facially neutral.

*Operational neutrality.* Utah's bigamy statute is likewise neutral in "its real operation." <u>Lukumi</u>, 508 U.S. at 535. Unlike the ordinances in <u>Lukumi</u>, the bigamy statute is not drafted to punish religious polygamy while excusing nonreligious polygamy. As stated, no one who commits the prohibited conduct is exempt from the statute's text. Moreover, nothing in the statute's operation suggests that its object is to prohibit polygamy as a religious practice. To the contrary, the only other reported decision of a prosecution under the current bigamy statute involved a man who committed bigamy for non-religious reasons. <u>State v. Geer</u>, 765 P.2d 1, 3 (Utah App. 1988). Ironically, that defendant unsuccessfully argued that the State selectively prosecuted "only those bigamists who practice bigamy for other than religious reasons."[3] <u>Id</u>. at 3.

In sum, Utah's bigamy statute is a valid, neutral statute of general applicability. It therefore does not violate the Free Exercise Clause and the State need not demonstrate a compelling state interest.

---

[3]Utah's prior polygamy statute, passed in territorial times, was also applied to non-religiously motivated polygamy. *See, e.g.,* <u>State v. Hendrickson</u>, 67 Utah 15, 245 P. 375 (1926) (defendant prosecuted for polygamy argued that he married his second wife in good faith, but erroneously believed that his first wife had divorced him).

**V.      EVEN ASSUMING THAT UTAH'S BIGAMY STATUTE IS NOT NEUTRAL, UTAH HAS A COMPELLING STATE INTEREST IN BANNING BIGAMY, IRRESPECTIVE OF THE REASON IT IS PRACTICED.**

"To satisfy the command of the First Amendment, a law restrictive of religious practice must advance 'interests of the highest order' and must be narrowly tailored in pursuit of those interests." Lukumi, 508 U.S. at 546 (internal quotation marks and citations omitted).  It is difficult to conceive of a governmental interest of an order higher than that of the marriage relationship.  "[M]arriage involves interests of basic importance in our society." Boddie v. Connecticut, 401 U.S. 371, 376 (1971).  The U.S. Supreme Court has recognized government's compelling interest in regulating this fundamental aspect of social life for well over a century:

> Marriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the legislature.  That body prescribes the age at which parties may contract to marry, the procedure or form essential to constitute marriage, the duties and obligations it creates, its effects upon the property rights of both, present and prospective, and the acts which may constitute grounds for its dissolution.

Zablocki v. Redhail, 434 U.S. 374, 399 (1978) (Powell, J., concurring in judgment) (quoting Maynard v. Hill, 125 U.S. 190, 205 (1888)).  For that reason, the area of domestic relations "has long been regarded as a virtually exclusive province of the States." Sosna v. Iowa, 419 U.S. 393, 404 (1975). See also Zablocki, 434 U.S. at 398-99 (Powell, J., concurring in judgment) ("A State 'has absolute right to prescribe the conditions upon which the marriage relation between its own citizens shall be created, and the causes for which it may be dissolved.'") (quoting Pennoyer

24

v. Neff, 95 U.S. 714, 734-735 (1878)).

While the Constitution does impose some limits on a state's right to regulate marriage, *see, e.g.,* Loving v. Virginia, 388 U.S. 1 (1967) (equal protection prohibits state from barring interracial marriages); Griswold v. Connecticut, 381 U.S. 479, 485-86 (1965) (state statute forbidding use of contraceptives unconstitutionally intrudes on right of marital privacy), the Supreme Court has always recognized the states' authority to define marriage and to choose the form that social institution should take. See Zablocki, 434 U.S. at 399 (Powell, J., concurring in judgment) (the State "has undeniable interest in ensuring that its rules of domestic relations reflect the widely held values of its people") (quoting Pennoyer, 95 U.S. at 734-75); Reynolds, 98 U.S. at 166 (recognizing government's interest in regulating "this most important feature of social life" to the extent of determining "whether polygamy or monogamy shall be the law of social life under its dominion"). *Cf.* Paris Adult Theatre I v. Slaton, 413 U.S. 49, 68 n.15 (1973) (observing that although "[s]tatutes making bigamy a crime surely cut into an individual's freedom to associate, . . . few today seriously claim such statutes violate the First Amendment or any other constitutional provision").

The Tenth Circuit Court of Appeals relied on this "undeniable interest" in Potter v. Murray City, 760 F.2d 1065, 1070 (10th Cir. 1985), when it held that Utah was, in fact, "justified, by a compelling interest, in upholding and enforcing its ban on plural marriage . . . ." Recognizing that the State had the right to regulate domestic relations, the Tenth Circuit

25

observed that monogamy had become "inextricably woven into the fabric of our society" and "the bedrock upon which our culture is built." Id. The court noted that based on that reality, Utah had "established a vast and convoluted network of other laws clearly establishing its compelling state interest in and commitment to a system of domestic relations based exclusively upon the practice of monogamy as opposed to plural marriage." Id.

Plaintiffs discount the State's interest in regulating social relationships. They assert that polygamy "has no more impact on state interests than does the nonreligious practice of multiple girlfriends or cohabitation by consenting, unmarried adults." Plaintiffs essentially contend that the State does not have a compelling interest in banning polygamy because there is no empirical support for doing so.

There are numerous reasons why a state has an interest in regulating the marital relationship. One of the most commonly recognized reasons is procreation; the encouragement of responsible procreation to ensure the continuation of society. "The fact remains that marriage exists as a protected legal institution primarily because of societal values associated with the propagation of the human race. Singer v. Hara, 522 P.2d 1187 1195 (Wash. Ct. App. 1974). (A challenge to Washington's marriage law by a homosexual couple.) In another decision regarding same sex marriage, an Arizona court summarized that state's position as follows:

> The state has a legitimate interest in encouraging procreation and child-rearing within the stable environment traditionally associated with marriage and that limiting marriage to opposite sex couples is rationally related to that interest.

> Essentially the state asserts that by legally sanctioning a
> heterosexual relationship through marriage, thereby imposing both
> obligations and benefits on the couple and inserting the State in the
> relationship, the State communicates to parents and prospective
> parents that their long -term, committed relationships are uniquely
> important as a public concern.

Standhardt v. Superior Court, 77 P.3d 451, 461 (Ariz. Ct. App. 2003) (rejecting claim of same

sex couple that federal constitutional right of privacy compels issuance of marriage licenses to

same sex couples).

Other arguments asserted include child rearing, tradition and interstate uniformity.  The

state interest in marriage related to child rearing is based upon the concept that children are better

provided for in the setting of a male-female marriage.  In response to this argument, the

Washington Court of Appeals found that "marriage is so clearly related to the public interest in

affording a favorable environment for the growth of children that we are unable to say that there

is not a rational basis upon which the state may limit the protection of its marriage laws to the

legal union of one man and one woman.  Singer v. Hara, 522 P.2d 1187, 1197 (Wash. Ct. App.

1974).

In response to the assertion that the historical definition of marriage should be given

deference, the court in Singer recognized that "marriage as now defined is deeply rooted in our

society". Singer v. Hara, 522 P.2d 1187, 1197 (Wash. Ct. App. 1974).  While the courts have

acknowledged the states' interest in preserving the traditional definition of marriage as being one

man and one woman, they have done so summarily.  Therefore, the cases do not indicate whether

27

the courts consider this interest sufficiently relevant to sustaining the validity of the historical definition of marriage.

Finally, changing the definition of marriage would impact the validity of those non-traditional marriages in other states. Utah has an interest in ensuring that the marriages of its citizens are recognized in other states and this might be difficult as no other states legally recognize plural marriages.

The foregoing concerns only demonstrate how significant and compelling the State's interest is in defining and choosing the form that society's most basic unit should take. The Legislature is uniquely qualified to make that important policy decision, first because it represents the widely held values of society at large, *see* Zablocki, 434 U.S. at 399 (Powell, J., concurring in judgment), and second, because it possesses the fact-finding ability to assess the relative merit of different forms of marriage in view of society's values. *Cf.* Laney v. Fairview City, 2002 UT 79, ¶¶ 107-08, 57 P.3d 1007 (Wilkins, J., concurring and dissenting) (court should not substitute its social policy judgments for that of the people's elected representatives); Craftsman Builder's Supply, Inc. v. Butler Mfg. Co., 1999 UT 18, 974 P.2d 1194 (Zimmerman, J., concurring in the result) (court should defer to legislative policy judgments and fact findings). Accordingly, this Court should affirm that the State has a compelling governmental interest in prohibiting bigamy in all its forms.

## CONCLUSION

Plaintiffs do not have standing to challenge the constitutionality of Utah Code Ann. § 76-7-101 because they have not been charged with a violation of the statute, have suffered no injury in fact from the application of the statute and are unlikely to do so.  Secondly, the Lawrence decision applies to private sexual conduct,  not to state sanctioned legal relationships. Any suggestion that the liberty protection announced in Lawrence must include legal recognition of polygamist marriages directly counters what the Court specifically excluded from its decision. Thirdly, though decided over 125 years ago, the rule enunciated in Reynolds is still valid today, and in fact has been cited recently as support by the United States Supreme Court on more than one occasion.

Plaintiffs' Motion for Summary Judgment should be denied and Defendant's Cross-Motion for Summary Judgment should be granted, dismissing Plaintiffs' Complaint.

DATED this __24__ day of May, 2004.

MARK SHURTLEFF
Attorney General

JERROLD S. JENSEN
Assistant Utah Attorney General

29

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing MEMORANDUM  IN

OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN

SUPPORT OF DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT was served

by mailing the same, first class postage prepaid, on the _24_ day of May, 2004, to the following:

Brian M. Barnard
James L. Harris Jr.
Utah Legal Clinic
214 East 500 South
Salt Lake City, UT 84111