Andrew Deiss (USB #7184)
JONES, WALDO, HOLBROOK & McDONOUGH
1500 Wells Fargo Plaza
170 South Main Street
Salt Lake City, Utah 84145-0444
Telephone: (801) 521-3200

Marci Hamilton (pro hac vice pending)
Cardozo School of Law
Attorneys for Tapestry Against Polygamy

# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| J. BRONSON, G. LEE COOK and D. COOK,<br><br>Plaintiffs,<br><br>vs.<br><br>SHERRIE SWENSEN, Salt Lake County Clerk,<br><br>Defendant. | **AMICUS CURIAE MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 02:04-CV-0021 TS<br><br>Judge Ted Stewart |

## INTRODUCTION

In this action, Plaintiffs contend that the statutes prohibiting the practice of polygamy in the State of Utah unconstitutionally limit their rights to personal and intimate relationships free from state interference. As detailed below, Plaintiffs' arguments are wholly without merit.

There is no dispute of material fact. Accordingly, Plaintiffs' motion can be resolved as a matter of law.

## ARGUMENT

### I. The Marriage Laws Excluding Polygamy Should Be Subjected to Rationality Review, Which Is a Standard They Plainly Satisfy

The free exercise of religion provides for the absolute protection of belief, Employment Div. v. Smith, 494 U.S. 872, 877 (1990); Reynolds v. United States, 98 U.S. 145, 164 (1878), but

653948v1

it permits the regulation of conduct. Smith, 494 U.S. at 879; Reynolds, 98 U.S. at 164; Potter v. Murray City, 760 F.2d 1065, 1069-70 (10th Cir. 1985). As the Utah Supreme Court has explained, "Freedom of religion has never been considered to be so absolute as to be beyond some regulation, and the practice of polygamy, human sacrifice, nudism, or other practices deemed so morally reprehensible as to be shocking to the conscience of the community may be restrained, even though practiced in the name of religion." International Union of Operating Eng'rs, Local No.3 v. Utah Labor Relations Bd., 115 Utah 183, 190 (1949). This case does not involve regulations that prohibit religious belief, but rather marriage laws that regulate the conduct of marrying multiple spouses.

It is beyond dispute that the Free Exercise Clause is no bar to a generally applicable, neutral law regulating conduct. Locke v. Davey, 124 S.Ct. 1307, 1312 (2004); Boerne v. Flores, 521 U.S. 507, 513-14 (1997); Smith, 494 U.S. at 885. Unless a law on its face treats religion with "animus" or "hostility," the law is presumed constitutional and subject to rationality review. Locke, 124 S.Ct. at 1312-13. Without question, the Utah and federal marriage laws outlawing polygamy are generally applicable and neutral on their face, and therefore subject to rationality review.[1]

The marriage laws here apply to all adults equally, regardless of religious belief or status. For this reason, federal and state courts have upheld these marriage laws for over a century. See

---

[1] Plaintiffs' argument that the right at issue is a "hybrid" right and therefore subject to strict scrutiny is unpersuasive. This Court has held that "will only apply the hybrid-rights exception to Smith where the plaintiff establishes a "fair probability, or a likelihood," of success on the companion claim. Axson-Flynn v. Johnson, 356 F.3d 1277, 1295-97 (10th Cir. 2004). As discussed in Part III, infra, Plaintiffs have no colorable claim under the right to privacy. Nor do they have any claim under the so-called right of association, which has never been applied by the Supreme Court to the institution of marriage. On Plaintiffs' theory, the states would be constitutionally precluded under the right of association from setting the requirements of marriage. The Supreme Court's tepid right of association jurisprudence does not begin to provide Plaintiffs such an expansive right.

653948v1      2

Utah 313, 318 (1886); State v. Barlow, 107 Utah 292, 304 (1944); In re State in Interest of Black, 3 Utah 2d 315, 339 (1955); see also Society of Separationists v. Whitehead, 870 P.2d 916, 940 (Utah 1993) (referring to Utah's long struggle with polygamy and "rights of conscience" and noting that Utah Constitution was drafted to "maintain neutrality among various religious groups as well as between those whose consciences were persuaded by religion and those whose consciences were not").

Plaintiffs ask this Court to reopen the long-settled issue of whether a law defining marriage so as to exclude polygamy is constitutional, despite the settled rule in this Circuit and at the Supreme Court that such laws defining marriage are constitutional. Reynolds, 98 U.S. at 166; White v. United States, 41 Fed. Appx. 325, 326 (10th Cir. 2002) (challenge of Utah's polygamy laws "is foreclosed by Supreme Court and Tenth Circuit precedent."); Potter, 760 F.2d at 1070. Indeed, Plaintiffs ignore the fact that the Court in Smith explicitly and repeatedly referenced the Supreme Court decision upholding the polygamy laws, Reynolds, favorably. Smith, 494 U.S. at 879, 882, 885, 890. Given the clarity of the free exercise doctrine and the settled precedent, Plaintiffs' case simply has no merit.[2]

Plaintiffs essentially ask this Court to reopen settled case law in order to examine the motive behind marriage legislation. They claim that the marriage laws excluding polygamy were enacted in response to a motive to suppress Mormons. They misunderstand constitutional law. The motive of the lawmaker is not the proper focus of any court. See United States v. O'Brien,

---

[2] Plaintiffs have failed to apprehend the distinction between what the Constitution requires and what it permits. Plaintiffs argue that free exercise rights require mandatory accommodation of their religious practices, but they have confused mandatory with permissive accommodation. The Free Exercise Clause does not mandate accommodation by the courts, though it may permit accommodation if the legislature sees fit to create an exemption. See Smith, 494 U.S. at 890 (discussing accommodations made for religious use of peyote through the political process).

653948v1   3

391 U.S. 367, 383 (1969) ("It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."); see also Church of Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520, 559 (1993) (Scalia, J., concurring). The legitimate constitutional issue is not what a lawmaker had in his mind or heart when he voted for a bill. Rather, courts are limited to examining the purpose of the law, based on the language of the law. See, e.g., Locke, 124 S.Ct at 1314-15.

The long-settled rule against examining legislative motive is both practical and prudential. First, it is impossible to determine the motives of any lawmaker on any given day. See Felix Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 539 (1947) ("We do not delve into the mind of legislators or their draftsmen, or committee members."). Moreover, legislators typically do not enact legislation for any single motive, but rather may have many motives. It is impossible for the courts to determine what the legislators' "true" motive is, and therefore the courts are in no position to determine the motives behind a neutral, generally applicable law. See Jane L. v. Bangerter, 61 F.3d 1505, 1515-16 (10th Cir. 1995) (declining to ascribe religious motive to legislators who passed an abortion-restricting statute).

Second, as a matter of mutual respect between the branches, the judicial branch is limited to examining the law as the legislature wrote it. When the language of a statute is clear, the judiciary has no power to delve into hidden motives. Bd. of Educ. of Westside Cmty. Sch. v. Mergens, 496 U.S. 226, 248-49 (1990) (O'Connor, J., plurality); McGowan v. Maryland, 366 U.S. 420, 469 (1961) ("[T]he private and unformulated influences which may work upon legislation are not open to judicial probing."); Sonzinsky v. United States, 300 U.S. 506, 513-514 (1937) ("Inquiry into the hidden motives which may move Congress to exercise a power constitutionally conferred upon it is

beyond the competency of courts.").[3] See also Richard A. Posner, Legal Formalism, Legal Realism and the Interpretation of Statutes and the Constitution, 37 Case W. Res. L. Rev. 179, 189 (1987) ("The framers communicate orders to the judges through legislative texts.... If the orders are clear, the judges must obey them.").

The courts may not consider legislators' motive, but rather must focus on the purpose of the law, which can be discerned from its language.[4] If the language is clear, the court may proceed no further in interpreting the statute.[5] But that inquiry is not an inquiry into what any particular group of legislators had in their hearts when they voted for a piece of legislation, but rather is an inquiry to illuminate the meaning of the language of the law.

The language of the federal and Utah laws defining marriage so as to exclude polygamy could not be clearer. The statutes do not single out or persecute any particular religious group, but rather constitute an across-the-board prohibition that applies to individuals regardless of their particular beliefs. This Court is simply foreclosed from considering the alleged historical evidence raised by plaintiffs.

---

[3] See also Richard A. Posner, Legal Formalism, Legal Realism and the Interpretation of Statutes and the Constitution, 37 Case W. Res. L. Rev. 179, 189 (1987) ("The framers communicate orders to the judges through legislative texts .... If the orders are clear, the judges must obey them").

[4] One plurality at the Supreme Court unfortunately treated motive and purpose as synonymous. See McDaniel v. Paty, 435 U.S. 618, 636 n.9 (1978) (plurality). Given the numerous Supreme Court cases holding that motive is irrelevant to statutory interpretation while purpose is the proper inquiry for the courts, the plurality's conflation of the two in that case is best treated as a misstatement of the law by a minority of the Court.

[5] See, e.g., Desert Palace v. Costa, 539 U.S. 90, 98 (2003) ("[T]he starting point for our analysis is the statutory text. ... And where, as here, the words of the statute are unambiguous, the judicial inquiry is complete.") (internal citations and quotations omitted); United States v. Lira-Arredondo, 38 F.3d 531, 533 (10th Cir. 1994). If the language is ambiguous, a court may look to other sources of meaning, including the legislative history, to determine the meaning of the statute. See, e.g., United States v. Gonzales, 520 U.S. 1, 6 (1997) ("Given the straightforward statutory command, there is no reason to resort to legislative history."); Security State Bank v. Commissioner, 214 F.3d 1254, 1256 (10th Cir. 2000).

The federal and Utah laws at issue here are very different from the law at issue in <u>Church of Lukumi Babalu Aye v. City of Hialeah</u>, 508 U.S. 520 (1993). In that case, the Supreme Court struck down a city ordinance that forbade the "sacrifice" of animals, because the ordinance on its face showed animus toward religion. As the Court recently explained the case: "In <u>Lukumi</u>, the city of Hialeah made it a crime to engage in certain kinds of animal slaughter. We found that the law sought to suppress <u>ritualistic animal sacrifices of the Santeria religion</u>." <u>Locke</u>, 124 S.Ct. at 1312 (emphasis added). In this case, the relevant laws regulate all marriages, not only those marriage practices of certain religious sects, and therefore <u>Lukumi</u> is inapposite, and rationality review applies.

The language of the federal and state laws here simply does not carry any religious freight, but rather imposes a neutral marriage requirement on all peoples, all of whom are subject to laws that punish "acts inimical to the peace, good order, and morals of society." <u>Interest of Black</u>, 3 Utah 2d at 339. It is not irrational for the federal and Utah legislatures to conclude that polygamy is inimical to the good order of society and is harmful to the well-being of women and girls. <u>See generally</u> Andrea Moore Emmett, <u>God's Brothel</u> (2004). Thus, the laws are safe from the Plaintiffs' attack.

Plaintiffs further attempt a disparate impact theory. Because the general and neutral rules defining marriage to exclude polygamy affects some who believe in polygamy as part of their religious credo, they argue the anti-polygamy laws must be unconstitutional. There are two reasons this argument cannot hold.

First, the Supreme Court has rejected "disproportionate impact" evidence to prove constitutional violations. <u>See, e.g.</u>, <u>Hernandez v. New York</u>, 500 U.S. 352, 359-60 (1991);

Washington v. Davis, 426 U.S. 229, 242 (1976). The courts are to examine a law's purpose, and not its impact, for proper constitutional analysis.

Second, the fact that a particular act inimical to the peace, good order, and welfare of the state is only practiced by a single group cannot make that public policy illegal. If the conduct is harmful to others, or to society in general, it can be proscribed, regardless of how many engage in the conduct. For example, a law that forbids adults from refusing to feed children is going to have a disparate impact on a religious sect that believes in starving babies to keep them pure. See, eg., Nicholson v. State, 600 So. 2d 1101 (Fla. 1992), cert. denied 506 U.S. 1008 (1992); State v. Kahey, 436 So. 2d 475 (1983); Commonwealth v. Cottam, 616 A.2d 988 (Pa. Super. 1992). By outlawing the starvation of children, the state has not acted beyond constitutional boundaries, even if there is only one sect that is engaged in such systematic starvation.

Similarly, with the laws defining marriage to exclude polygamy, the fact that such laws might have disproportionate impact on groups that believe in polygamy for religious reasons, does not in itself make the laws unconstitutional. These laws are generally applicable and neutral, and the impact is irrelevant for this Court's purposes.

## II. The Public Policy Definition of Marriage Belongs to the Utah State Legislature, Which Means that Plaintiffs' Policy Arguments in Favor of Polygamy Are Being Addressed to the Wrong Branch of Government

Plaintiffs' central argument is captured on pages 25-27 of their brief, where they attempt to persuade this Court that legalizing polygamy is a good idea. These arguments are utterly irrelevant to the constitutional issues raised.

## A. The Definition of the Institution of Marriage Is a Legislative Function

Indeed, they are addressed to the wrong branch of government. If Plaintiffs believe these are correct public policy reasons, they should present them to the state legislature. See, e.g., Gottling v. P.R. Inc., 61 P.3d 989, 997-98 (Utah 2002); Clark v. Clark, 27 P.3d 538, 544 (Utah 2001), cert. denied, 534 U.S. 1066 (2001) (Wilkins, J. concurring) ("It is the legislature to which our citizens have a general right of redress and petition when they feel the law has been incorrectly decided."); State v. Herrera, 895 P.2d 359, 362 (Utah 1995) ("This delicate balancing of public policy is better accomplished in the legislature than in the courts."). Legislatures are well-suited to such public policy debates, in light of their capacity to foster public debate, to hold hearings, and to commission studies. See Jenkins v. Swan, 675 P.2d 1145, 1149-50 (Utah 1983) ("[T]he airing of generalized grievances and the vindication of public rights are properly addressed to the legislature, a forum where freewheeling debate on broad issues of public policy is in order.").

The courts, in contrast, are not in a good position to make determinations about marriage policy. They cannot engage in the same wide-ranging investigation, but rather are limited to the arguments raised by individual parties in individual cases. See Lynn D. Wardle, The Quandry of Pro-Life Free Speech: A Lesson from the Abolitionists, 62 Alb. L. Rev. 853, 876-77 (1999). This Court is certainly competent to determine the constitutional issues raised, but it is not permitted to decide the public policy of the state of Utah on the issue of marriage. See Bills v. United States, 857 F.2d 1404, 1407 (10th Cir. 1988) ("Whatever views we may entertain as to wise public policy on these matters, it seems clear that they are issues to be resolved by the legislature of Utah, and not by federal courts."); see also Herrera, 895 P.2d at 362.

Neither the federal nor the Utah state constitutions mandate a particular form of marriage. Lynne Marie Kohm, Symposium:Liberty and Marriage - Baehr and Beyond: Due Process in 1998, 12 BYU J. Pub. L. 253, 266 (1998) ("[T]here is no constitutional provision protecting marriage in any form."). Rather, the requirements shaping the institution of marriage are legislative policy choices. Id. ("[L]egislatures can govern marriage without constitutional violations."). The legislatures, which are charged with acting in the broader public's best interest and welfare, are far better suited to make such difficult public policy choices.

**B. The State Legislatures Are in the Best Position to Define Marriage**

The states hold primary power over laws that affect the morals and general welfare of their citizens, and in particular family law. They "are far better situated than the national government to develop and sustain a normative political discourse on family life. Moreover, regulatory diversity among the fifty states preserves some measure of individual and family choice in matters touching upon the formative conditions of human identity. See Anne C. Dailey, Federalism and Families, 143 U. Pa. L. Rev. 1787, 1791-92 (1995). By leaving the definition of marriage to the state legislatures, the constitutional order permits fifty social experiments to run simultaneously. See New State Ice Co. v. Liebmann, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."). Each state has the capacity to consider what is in the best interest of its people, and then to test legal regimes to find the right balance. See Dailey, supra, 143 U. Pa. L. Rev. at 1861-80. Such experimentation is especially important in politically contested areas like the

important in politically contested areas like the current debates over marriage law, because the coexistence of different experiments permits the various states to learn from each other.

The fact that the law in Reynolds was enacted by Congress does not change this fact. When Congress enacted the marriage definition governing the Territories in the nineteenth century, Congress was acting as the local government for the Territories, not in its capacity as a federal rulemaker. Congress has only enacted laws against bigamy and polygamy through its federal role when federal interests are at stake. See, e.g., 8 U.S.C. § 1182 (2004) (Inadmissible aliens include "Any immigrant who is coming to the United States to practice polygamy is inadmissible."); 8 U.S.C.S. § 1227 (defining deportable offenses to include crimes of moral turpitude, which includes bigamy).[6] Accordingly, the vast majority of marriage law, and family law in general, has been left to the states to determine, and Plaintiffs are addressing their arguments to the wrong branch of government.

## II. The Federal and State Laws Defining Marriage So as to Exclude Polygamy Are Not Unconstitutional Restrictions of Any Supposed Right to a Particular Form of Marriage

Plaintiffs attempt to piggyback their preference for polygamy onto the Supreme Court's recent decision in Lawrence v. Texas, 539 U.S. 558 (2003). They have misread that decision. Lawrence stands for the proposition that adults have a right of privacy regarding their sexual practices in private. Lawrence, 539 U.S. at 578. It is too far a leap to then conclude that the

---

[6] See also 10 U.S.C.S. § 934 art. 134 (2004) (indicating bigamy is a prosecutable offense under the Uniform Code of Military Conduct); 18 U.S.C.S. § 1152 (2004) (bigamy committed on Indian land is within federal jurisdiction, citing Re Mayfield, 141 U.S. 107 (1891)).

653948v1            10

Court held that the states would be displaced from their historic role in determining marriage law. The decision itself disavows any intention to determine marriage law.[7] Id.

The existence of a fundamental right of privacy over one's body, which was recognized in Lawrence, does not translate into a right to determine the parameters of the social institution of marriage. Marriage is a social construct--not an inherent element of the human condition--and therefore marriage law is a legislative policy choice, not a constitutional mandate. See Nan D. Hunter, Marriage, Law, and Gender: A Feminist Inquiry, 1 Law & Sexuality 9, 13 (1991); Maynard v. Hill, 125 U.S. 190, 205 (1888). When state legislatures construct the institution of marriage, they must weigh multiple social ends and needs. Plaintiffs' attempt to construe the institution of marriage as a fundamental right over one's body cannot be supported.

For the foregoing reasons, the Tapestry Against Polygamy urges this Court to reject Plaintiffs' constitutional arguments and to uphold the federal and state marriage laws that exclude polygamy.

DATED this 28 day of July, 2004.

Respectfully submitted,

JONES WALDO HOLBROOK & McDONOUGH PC

By Andrew G. Deiss
Tapestry Against Polygamy

---

[7] The present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct or prostitution. It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter.


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 28 day of July, 2004, I caused a true and correct copy of the foregoing Amicus CuriaeMemorandum in Opposition to Plaintiffs' Motion for Summary Judgment, to be mailed, postage prepaid, to the following:

>Brian M. Barnard
>Utah Legal Clinic
>214 East Fifth South Street
>Salt Lake City, UT 84111-3204
>
>Julie V. Lund
>Mark Shurtleff
>Jerrold S. Jensen
>Utah Attorney General's Office
>State Agency Counsel
>160 East 300 South Street, 5th Floor
>P.O. Box 140857
>Salt Lake City, UT 84114-0857

*Kathy Sorg*